LARRY SCHEIBEL, Plaintiff-Appellee, v. RICK GROETEKA, Defendant-Appellant.

Fifth District   No. 5—87—0169

Opinion filed May 4, 1989.

Cornelius Thomas Ducey, Jr., and Rhonda J. Kattelman, both of Ducey, Feder & Ducey, Ltd., of Belleville, for appellant.

Pamela A. Klekner, of Dunham, Boman & Leskera, of East St. Louis, and Dale M. Funk, of Apoian, Ross & Funk, P.C., of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Rick Groeteka, appeals from a jury verdict entered in the circuit court of St. Clair County against defendant and in favor of plaintiff, Larry Scheibel, for $100,000 reduced by 50% for plaintiff's negligence, for a total of $50,000, for damages occasioned by alleged negligence in a car accident. This court affirms.

On December 9, 1980, plaintiff filed this action seeking $6,248.68 plus court costs. On March 9, 1981, plaintiff filed an amended complaint against defendant seeking no more than $50,000. On July 20, 1981, defendant filed his answer. On March 19, 1985, the case was voluntarily dismissed after opening statements, but prior to any witnesses being called. On April 18, 1985, plaintiff refiled the lawsuit against defendant. On July 14, 1986, defendant moved to amend his answer to plaintiff's amended complaint. On July 24, 1986, the trial court granted defendant's motion to amend. On September 17, 1986, plaintiff filed an amended complaint seeking $121.73 for property damage to plaintiff's vehicle. Later, plaintiff voluntarily dismissed this count.

The trial started on September 17, 1986, and was completed on September 19, 1986. On September 17, 1986, prior to trial, plaintiff moved to bar defendant's expert witness, Dr. Simon Hornstein, from testifying. The trial court found that plaintiff's interrogatories requesting a disclosure of experts under Supreme Court Rule 220 (107 Ill. 2d R. 220) had been answered by defendant with proof of service on August 19, 1986, and disclosed no experts. Further, at the time of *voir dire* of the jury, defendant did not disclose Dr. Hornstein as a witness expected to testify at trial. Plaintiff's motion to bar expert witness, Simon Hornstein, was granted.

On September 19, 1986, the trial court also barred defendant from introducing the testimony of F.J. Accardio because defendant did not disclose him as a witness expected to testify at trial at the time of jury *voir dire*. Counsel for defendant then made an offer of proof. Had Accardio been allowed to testify, he would have stated that he had examined defendant's vehicle in May 1980 and had found no damage to defendant's vehicle nor any evidence of repairs.

After opening statements were made by parties, defendant

moved for a mistrial based upon plaintiff's counsel's statement that plaintiff was working only because of his poor financial condition. The trial court denied defendant's motion for a mistrial. On September 18, 1986, plaintiff called his first witness, the defendant, pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). Defendant testified that on the date of the accident, February 20, 1980, he was 20 years old and lived with his parents. Defendant owned a black Ford pickup truck which he had purchased in 1978. The truck had a black roll bar in the bed and a brush bar on the front grill. According to defendant, there were decals on the front, back, and sides of the truck which had been put on at the factory. On the back of the truck there was a "Ford" emblem, orange in color, which measured 6 inches by 4½ feet. Defendant stated that he had several license plates on the truck and could not remember the plate number which was on the truck on February 20, 1980.

Defendant denies any involvement in a collision on Shiloh Road at the Route 50 intersection on February 20, 1980, or knowing plaintiff prior to the filing of this lawsuit. Defendant testified that on February 20, 1980, he had arrived at the home he shared with his parents at approximately 6:30 or 7 a.m. after working from 8 p.m. to 6 a.m. He took a shower, ate breakfast, and then went to bed between 8:30 and 9 a.m. He woke up at approximately noon when his fiancee came by for lunch. He stated that his fiancee stayed approximately 45 minutes to one hour. He then went back to sleep on the couch. He testified that the truck was not there when his girlfriend came because his mother had taken it. Defendant did not check to see if his truck was in the driveway. His knowledge that the truck was gone was based upon his mother's telling him she had borrowed the truck and his fiancee's statement that his truck was not in the driveway.

Plaintiff was the next witness called to testify. Plaintiff testified that on February 20, 1980, he was living on Little Oak School Road just northeast of O'Fallon. On that day, plaintiff left his home around noon to bid on a fencing job. Plaintiff had his own fencing company at this time. Plaintiff was in his 1975 Chevrolet pickup truck, which was in good mechanical condition. At the intersection of Little Oak School Road and Scott-Troy Road, not far from plaintiff's home, plaintiff saw a black Ford pickup truck with a roll bar stopped and throwing garbage out into a ditch. There were two occupants in the truck, both white males with small to medium builds. One was in the back throwing garbage out. When they saw plaintiff, they got in their truck and left. Plaintiff was following behind the truck and was able to get the license plate number. Plaintiff wrote down the number on an envelope

which had been lying in the seat next to him. Initially, plaintiff planned to give the license plate number to the sheriff's office and let them take care of it. He then followed the truck toward Highway 50. Plaintiff testified he was not in pursuit of the truck, as he was on his way to a bid and the truck was going the same direction. When the black Ford pickup truck got to Highway 50, it made a right turn and headed toward O'Fallon, which was the same direction plaintiff had to go. Plaintiff then followed the black truck on Highway 50 to the Shiloh Road intersection where both vehicles had to stop because of a stop sign. The black Ford was going to turn left. There was no oncoming traffic so plaintiff decided to pull around the black vehicle and make the driver pull over. Plaintiff wanted to tell the occupants of the truck that if they picked up the garbage, he would not call the sheriff's office and turn over the license plate number. As both vehicles turned left onto Shiloh Road, plaintiff testified that he turned his flashers on and pulled up alongside the black Ford. Plaintiff also testified that he honked his horn. The driver looked over and plaintiff motioned for the black truck to pull over. Plaintiff estimated both vehicles were traveling at approximately 10 miles per hour. Plaintiff then pulled around the front of the black Ford, physically turned his body around to look back at the black truck and at the same time eased up on the gas. The black truck was directly behind plaintiff and collided with him in the right lane of traffic. The force shoved plaintiff forward. The black truck went into the ditch, kept on moving, went around plaintiff, and drove toward Shiloh.

On cross-examination, plaintiff testified that he was not sure whether his brake lights or his blinkers were on when he pulled ahead of the black truck. Plaintiff did not get a close look at the two people in the truck. Plaintiff does not know their hair color or if they were wearing hats. Further, plaintiff could not positively identify defendant as the driver of the black Ford.

After impact, plaintiff got out of his truck to look for damage. The only thing plaintiff saw was a cracked windshield. Over defendant's objection, plaintiff testified that in his opinion the driver of the black truck had the opportunity to stop his vehicle and avoid the impact.

Immediately after the collision, plaintiff's back bothered him slightly, but he continued on to his destination. Plaintiff did stop and call the sheriff's office to make a report over the phone. Later, a deputy sheriff came out and took a full statement. The sheriff's department did not locate a black Ford truck with the license plate number plaintiff had given them, being 444 023B. Plaintiff went home and lay

down because his back and neck were irritating him.

The next day, plaintiff woke up and his back and neck pains were worse. Plaintiff went to Memorial Hospital in Belleville, where he was treated and released. Plaintiff was told to consult with his family physician. One or two days later, plaintiff went to his family doctor, Dr. Efren Naguit, who prescribed muscle relaxers, pain pills, and physical therapy at the hospital. Dr. Naguit treated plaintiff until the fall of 1980 when he sought other treatment because, according to plaintiff, he was not satisfied with the treatment by Dr. Naguit.

In 1981, plaintiff consulted with several other doctors concerning his back injury. Plaintiff testified he had been treated by Dr. Schultz in December 1981 and continued to seek treatment with Dr. Schultz through the date of trial. Plaintiff was also treated by Dr. Herbert Dexheimer from 1981 through trial. Plaintiff found the treatment of both Drs. Schultz and Dexheimer to be of little help in relieving back pain. As part of Dr. Schultz' treatment, plaintiff went through a series of epidural blocks in 1984. Plaintiff also sought treatment with Dr. Arabinda Das from approximately August 1981 through the time of trial. Plaintiff did not tell Dr. Das that he had been a patient of Dr. Naguit. Plaintiff did not tell Dr. Das about Dr. Naguit because he had been referred to Dr. Das by Dr. Dexheimer. Dr. Das performed acupuncture on plaintiff. Additionally, plaintiff was hospitalized in December 1981 by Dr. Das. Dr. Dexheimer also consulted on plaintiff's hospitalization. Plaintiff testified that the acupuncture relieved pain only temporarily. As soon as plaintiff went out in the cold air or lifted something, he was in as much pain as prior to the acupuncture treatment. Plaintiff found his back pain to be more intense during cold weather.

Plaintiff testified that he purchased all medications prescribed for him by his treating doctors from 1980 through the trial. Plaintiff believes his back condition is deteriorating. He can no longer work as a carpenter because of the pain he experiences.

There are many ambiguities in plaintiff's testimony concerning his employment from the years 1977 through trial. The following is what could be adduced by this court concerning plaintiff's employment history. Plaintiff is now employed as a laborer. Over defendant's objection, plaintiff was allowed to testify that the only reason he is working is because he has no other way to support himself and his family. Plaintiff's friend is a business agent and he put plaintiff on a job that does not require as much physical labor. Before plaintiff was a laborer, he worked for St. Clair County from August 1984 through January 1986 as an instructor for the weatherization program. In either

1977 or 1979, defendant started a fencing business in which he constructed both chain link and wooden fences. This business terminated in August 1983, because plaintiff's back hurt and he was unable to do the construction work.

On cross-examination, plaintiff testified that he filed a lawsuit against Chevron Chemical and K mart as a result of exposure to toxic fumes in February 1982. The case is pending in Federal court. In the Chevron suit, plaintiff seeks past and future earnings which he has lost and will lose by virtue of his exposure to toxic chemicals.

Earl Hartman was the next to testify for plaintiff. Hartman investigated the auto accident in which plaintiff was involved. Hartman did his investigation in March 1980, starting with a license plate number (444 023B) which had been furnished by plaintiff. Hartman located the pickup truck at defendant's residence. Both the license plate number and the description of the truck furnished by plaintiff matched defendant's vehicle. Defendant admitted to Hartman that it was his truck. Using his report to refresh his memory, Hartman stated that he could not find any real damage to defendant's truck.

Next, plaintiff's wife, Barbara Scheibel, testified that when plaintiff arrived home after the collision, he had pain in his back and neck which kept getting worse. The first few months after the collision, he was in a lot of pain. Plaintiff could not sit for long periods of time, nor could he sleep through the entire night. The treatments plaintiff received would give him temporary relief, but the pain would then crop up as severe as ever. The epidural blocks he had received seemed to reduce the pain for a few weeks at a time. Plaintiff's wife testified that plaintiff had become difficult to live with after the collision. Generally, plaintiff comes home from work, takes a shower and does not want to eat dinner. He then goes to bed early, and it takes him a long time to get moving in the morning because of the pain. Additionally, plaintiff and his wife do not often go out because of plaintiff's pain.

The evidentiary deposition of Dr. Efren Naguit was read into evidence. Dr. Naguit is plaintiff's family physician. Dr. Naguit examined and treated plaintiff on February 26, 1980, for neck and low back pain. At that time, plaintiff told Dr. Naguit that he had been in a car accident on February 20, 1980, a rear-end hit and run. Dr. Naguit's diagnosis was that plaintiff suffered from acute low back strain as a result of the injury he suffered from the February 20, 1980, car accident. At this time, Dr. Naguit also reviewed the X rays taken at Memorial Hospital on February 20, 1980. The X rays of plaintiff's neck were normal in Naguit's opinion. The X rays of the lower back were normal, except for degenerative changes (arthritis) which, according

to Dr. Naguit, had to exist before February 20, 1980. On plaintiff's first visit to Dr. Naguit, treatment consisted of a muscle relaxant shot and a prescription for muscle relaxant pills to be taken four times per day. In addition, Dr. Naguit told plaintiff to go to physical therapy for his lumbar spine three times per week. Dr. Naguit believed plaintiff could work at this time.

On March 4, 1980, Dr. Naguit again saw plaintiff. Plaintiff complained of even worse pain. Dr. Naguit's examination of plaintiff on this date showed acute low back strain as well as cervical strain. Dr. Naguit believed that plaintiff's back and neck pain were a result of the car accident on February 20, 1980. Dr. Naguit's treatment on this date was the same treatment he administered on February 20, 1980. Plaintiff continued to seek treatment with Dr. Naguit during March and April 1980.

On May 6, 1980, Dr. Naguit found plaintiff's acute low back strain much improved. Plaintiff told Dr. Naguit he was much better and wanted to go back to work. Plaintiff was told by Dr. Naguit to discontinue physical therapy on a regular basis and go to physical therapy only when plaintiff's back began to hurt. No muscle relaxant shot was administered, but Dr. Naguit told plaintiff to continue to take his muscle relaxant pills four times per day and return in two weeks.

On May 17, 1980, Dr. Naguit examined plaintiff and found him to have a full range of motion over the lumbar spine area. According to Dr. Naguit, plaintiff told him his back felt great. It was Dr. Naguit's opinion that plaintiff had completely recovered from the February 20, 1980, car accident and that plaintiff could return to work on May 19, 1980.

Dr. Arabinda Das was the next witness to testify for plaintiff. Dr. Das testified that he saw plaintiff for the first time on August 10, 1981. Plaintiff was complaining of back and neck pain and said he had such pain since February 1980, when he was rear-ended in an auto accident. Dr. Das gave plaintiff a physical examination in which he found plaintiff's neck movements to be normal but tenderness on the muscles at the back of plaintiff's neck as well as tenderness of the dorsal and lumbar spine. Dr. Das' diagnosis was "back sprain, post traumatic, severe cervical sprain and neck arm syndrome. Also has neck headache syndrome *** And dorsal sprain. Lumbar sprain. With right sciatica." Dr. Das' opinion was that plaintiff's whole back was sprained. As treatment, Dr. Das performed acupuncture, prescribed Darvon, Valium, and arnica, an herbal medicine. Dr. Das knew that plaintiff was doing construction work and placed no limitation on plaintiff.

Plaintiff continued the same treatment with Dr. Das until April 13, 1982, when Dr. Das prescribed XanaX. The XanaX was soon stopped because it did not help. Plaintiff would feel better on some days and worse on others. On July 20, 1982, plaintiff was complaining of problems with his back as severe as ever and pain from the top of his neck to his lower back. At this time, Dr. Das discontinued the Darvon prescription and substituted Tylox. On August 16, 1982, Dr. Das began prescribing Empirin Compound Number 4, four times per day. On September 13, 1982, plaintiff complained to Dr. Das that his hands were "sleeping." Additionally, plaintiff complained that the upper part of his body (trunk) and legs were hurting. Plaintiff demanded acupuncture on September 13, 1982.

The same type of treatment continued through the fall of 1982. On November 8, 1982, plaintiff complained to Dr. Das that the pain all over his back and his right arm was getting ten times worse. Plaintiff told Dr. Das that the cold air in the winter made his condition worse. On December 16, 1982, plaintiff complained of involuntary movement of his muscles for which Dr. Das prescribed 50 milligrams of Talwin, of which 30 milligrams were administered intramuscularly. From December 17, 1982, through December 22, 1982, plaintiff was hospitalized for back pain by Dr. Das. Dr. Dexheimer consulted with Dr. Das on the admission of plaintiff. Dr. Das called in two doctors to examine plaintiff: Dr. Edward Rose, a rheumatologist; and Dr. Ronald Welch, a neurologist. Dr. Rose submitted a report of his findings to Dr. Das. Dr. Rose believed that plaintiff suffered from a limitation of the spinal flexion. Normally, the spinal column is flexed to 180° while one is bending down, but plaintiff could only flex up to 45°. Dr. Rose prescribed phenylbutazone to reduce pain and Flexaril to decrease muscle spasms. After plaintiff's release from the hospital, Dr. Das next saw plaintiff on December 28, 1982. Plaintiff stated that the pain had been reduced because of the prescribed muscle relaxers and pain medication. However, by January 13, 1983, plaintiff was no longer receiving phenylbutazone because it is a toxic medicine whose side effects are both common and dangerous. Throughout January and February 1983, plaintiff complained of back pain. In Dr. Das' opinion, plaintiff's complaints are consistent with plaintiff's injury from the February 20, 1980, car accident. After February 1983, Dr. Das saw plaintiff only sporadically. Dr. Das did not see plaintiff at all during 1984. At his 1985 visits to Dr. Das, plaintiff's complaints were the same, and Dr. Das found no change in plaintiff's condition. Dr. Das last saw plaintiff on May 24, 1986, and told him to return in 25 days, but plaintiff had not returned through the time of trial. Dr. Das' total

charges for treatment for plaintiff's back injury were $2,130.

Despite treatment, plaintiff's condition had not improved according to Dr. Das. In Dr. Das' opinion, plaintiff's prognosis remains poor.

During cross-examination, Dr. Das agreed that his specialty is psychiatry, for which he is board-certified. Dr. Das also admitted that he was not aware that Dr. Naguit had treated plaintiff immediately after the February 20, 1980, accident.

In 1982, according to Dr. Das, plaintiff fell and sustained a fractured ninth rib on the left side. During January 1982, plaintiff did not complain of back pain, but rather pain related to his broken rib. In February 1982, Dr. Das treated plaintiff for inhalation of toxic fumes. Dr. Das agreed that plaintiff's treatment from February 1982, through June 1982, was for exposure to toxic fumes rather than back problems. Dr. Das agreed that the toxic fumes could contribute to some of plaintiff's complaints of a muscular skeletal nature.

At the close of plaintiff's case, defendant moved for a directed verdict which the trial court denied. Defendant then took the stand.

Defendant testified that he had never been on Shiloh Road and was not there on February 20, 1980, throwing out trash. Defendant testified that he had seen a truck in Collinsville that looked similar to his around February 1980. On cross-examination, defendant could not produce the license plate number on this other truck. Defendant first heard of the alleged accident in which plaintiff was involved when Mr. Hartman came out to look at defendant's truck.

Patricia Gumm, mother of defendant, was the next witness. She testified that her son lived with her in February 1980. On February 20, 1980, defendant got home from work between 6 and 6:30 a.m. Defendant's mother took defendant's truck at about 8:30 a.m. to return a Roto-Rooter. After she returned the Roto-Rooter, she stopped at various other locations. On direct examination, she testified she returned home at 11 a.m. to deliver groceries. She left again and did not return until noon. She testified that she left again in defendant's truck and did not return until 1:30 p.m. On cross-examination, however, defendant's mother testified that she returned home at noon as her son's fiancee arrived for lunch. On cross-examination, defendant's mother admitted she did not drive the truck after noon. However, she said her son's keys remained in her possession until 2:30 p.m. when she left for work. At that time, she took her own automobile to work. Mrs. Gumm testified that to her knowledge there was not a "Ford" emblem in large letters on the back of her son's truck. She did discuss orange-colored designs on the sides of the truck.

Defendant's wife, his fiancee on February 20, 1980, Valerie

Groeteka, was the next witness to testify. She testified that during February 1980, she would go over on her lunch hour to visit defendant. She worked Tuesday through Saturday and her lunches were from noon to 1 p.m. She generally stayed at defendant's home approximately one-half hour. Valerie Groeteka agreed that she sometimes went to lunch from 11 a.m. until noon; however, she stated that that was only on rare occasions. From Mrs. Groeteka's testimony, it is clear she does not remember exactly what she did on February 20, 1980. She was testifying as to her normal habits during the month of February 1980.

Finally, Michele Moore, a physical therapist at Memorial Hospital, was unavailable to testify, but her deposition was read into evidence. Michele Moore saw plaintiff on February 11, 1981. At that time, plaintiff complained that there was a tightness and pulling sensation in the muscles in his lower back. Plaintiff told Michele Moore that this pain started after he worked on some frozen water pipes in December 1980. Plaintiff also told Ms. Moore that he had no pain at all throughout the summer. In addition, plaintiff complained of pain in his right leg, but stated that it was a long-standing problem, as a plastic artery had been inserted in his right leg in 1979.

On cross-examination, Ms. Moore agreed that plaintiff had not told her that he physically twisted his back while working on the frozen pipes, but rather after he did this work, he felt a pulling sensation. Ms. Moore agreed that she was not sure how plaintiff injured his back. Plaintiff did not tell her that he had been injured in an automobile accident.

■ Defendant's first issue on appeal is whether the trial court erred in permitting plaintiff to testify that in his opinion the truck which struck him had sufficient distance in which to stop before striking the rear of plaintiff's vehicle. Defendant specifically argues that the question asked of plaintiff called for a conclusory answer on the ultimate issue of negligence, and, further, there was no reason why plaintiff could not adequately communicate to the jury the facts upon which his opinion was based. Therefore, according to defendant, the opinion testimony expressed by plaintiff was superfluous and its admission constituted reversible error.

The general rule is that to be admissible, opinion testimony must be of assistance to the trier of fact. (*Freeding-Skokie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 483 N.E.2d 524.) Illinois courts rely on Rule 701 of the Federal Rules of Evidence in considering the admissibility of opinion testimony. Rule 701 provides:

"If the witness is not testifying as an expert, witness' testi-

mony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701.

During direct examination of plaintiff, the following colloquy ensued:

"Q. Between the point in time when you saw the individuals throwing the garbage out of the truck and the time you turned left with the other truck onto Shiloh Road did you ever lose sight of the truck?

A. No, I didn't.

Q. What happened next, Mr. Scheibel, after the—Mr. Groeteka's truck turned left and you turned left?

A. As I pulled alongside him I turned my flashers on. I pulled up alongside. I honked my horn. When the guy looked at me from the truck I motioned for him to pull over, that I wanted to talk to him. We were only going at a slow speed, around at that point maybe ten miles an hour. They were starting from a dead stop, and I was just rolling into the curb. I pulled ahead of them until I could see their truck in the rearview mirror, pulled over a little bit, and as I started easing up, you know, off the gas, I turned to look over my shoulder out the rear window, and I was shocked to see the truck was already right behind me and had collided with me. After this it just, you know, shoved me forward, and he went down into the ditch, up around me and kept on going into Shiloh, and I was just kind of stunned. I got out and looked at the back of my truck, and there wasn't any damage. There was—I have a real heavy bumper on the back of my truck, and there was a brush guard on the front of this truck is what—when I turned around that's what I—all I could see was this brush guard coming at me, and it hit the bumper and the only damage I could find was a cracked windshield.

Q. Damage to your truck?

A. Right.

Q. Just to clarify a point, Mr. Scheibel, when you made the left turn at the same time the other truck made the left turn, in which lane was either truck or which side of the truck were you on?

A. I was on the left side of the other truck. At that point in the road it's very wide. It's, I would say, over a hundred feet

wide where it comes out to meet Highway 50 and merge with it.

Q. And then at what point in time did you look in the rearview mirror to see where the other truck was?

A. Just before I pulled back in and started, you know.

Q. Do you have an estimate as to how far behind you the other truck was at the time you looked in the rearview mirror?

A. It was two or three car lengths.

Q. Do you have an estimate as to how fast the other truck may have been going at this time?

A. Oh, it could have been going—it had to be less than 20.

Q. In relationship to the road, side, middle and so forth, where was your truck at the time of the impact, the collision with the other truck?

A. It was sitting in the right-hand lane where I had pulled back in to turn around. I thought they were going to stop because I had—you know, they looked at me when I pointed to pull over, and when I got up far enough I could see them in the rearview mirror I thought they were, you know, going to pull over and stop.

Q. In your opinion, Mr. Scheibel, would the driver of that truck have had opportunity to stop his vehicle as you pulled over to the side of the road?

MR. DUCEY [counsel for defendant]: Show an objection. It calls for an opinion which this witness is not qualified to give and cannot give.

THE COURT: That will be overruled. He can answer. You may answer, Mr. Scheibel.

THE WITNESS: Well, yes, he could have definitely stopped."

■ Taken in its context, plaintiff's statement that defendant could have stopped his vehicle is distinguishable from *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 483 N.E.2d 524, cited by defendant. In *Freeding-Skokie*, plaintiff, truck owner and driver, brought suit against defendant seeking to recover damages to plaintiff's truck allegedly caused by defendant's negligence. As defendant was making a left turn from the westbound lane, her car was struck by plaintiff's truck, which was headed eastbound. The following direct examination of the plaintiff took place:

" 'Q. [by plaintiff's counsel] Jim [James Harris], in your opinion, is there any way you could have avoided this accident?

MR. SMITH [defense counsel]: Your Honor, I will object to

that. That's a matter for the jury to decide.

THE COURT: Overruled. He can answer that question.

A. No, Sir.'

During direct examination of an occurrence witness, Thomas McCarty, the following exchange occurred:

'Q. [by plaintiffs' counsel] When that truck, when the car turned in front of the truck, did you have the impression that the truck was so close that the car should never have turned?

MR. SMITH: Your Honor, that's a leading question. I'll object to it.

THE COURT: As to the leading nature of it, I'll sustain.

Q. What, if any, impression did you have with respect to that, sir?

A. My impression was that the driver of the car did not see the truck and turned in front of the truck.

Q. Why do you say that?

A. Just, one would not have made that turn had they seen the truck coming from that distance.

Q. From what you say, sir, as you're sitting there, coming up behind that accident and you see the car turn in front of the truck, was there anything that you saw there, any way that the truck could have avoided that accident, sir?

MR. SMITH: Your Honor, I'll object to that. That's the ultimate issue in the case. That's for the jury to decide.

THE COURT: He doesn't have to put his experience in life on the shelf either. Overruled.

Q. I guess you answered that, right, sir? You said "no?"

A. I said no.' " (108 Ill. 2d at 219-20, 483 N.E.2d at 525.)

In *Freeding-Skokie*, our supreme court held that the opinion testimony of lay witnesses that the collision between the automobile and the truck could not have been avoided was superfluous and its admission constituted reversible error. Likewise, in *Strasma v. Rager* (1986), 145 Ill. App. 3d 826, 495 N.E.2d 1343, another case cited by defendant, the court held that defendant's answer was on the ultimate issue of negligence and highly prejudicial.

In the instant case, plaintiff went to great lengths to convey the facts which he perceived prior to his statement that the driver of the other car could have stopped. In view of the context, the trial judge's ruling was within an acceptable range of discretion.

Defendant's second issue on appeal is whether the trial court erred when it admitted plaintiff's exhibits 4 and 6 through 13. Plaintiff's exhibit number 4 was a hospital bill from Memorial Hospital in

Belleville which indicated plaintiff was admitted by Dr. Das on December 17, 1982. Plaintiff's exhibits numbered 6 through 13 were copies of bills for prescription medications dated from August 10, 1981, to 1986. Defendant argues that in admitting these exhibits, the trial court allowed the jury to consider evidence pertaining to plaintiff's condition and/or treatment which was not related to the February 20, 1980, accident, and which, therefore, lacked any causal connection to the accident and plaintiff's injuries sustained as a result of said accident. According to defendant, the jury was ultimately allowed to compensate plaintiff for expenses which were totally unrelated to the auto accident of February 20, 1980. Plaintiff replies that the evidence clearly shows a causal connection between both the hospital bill, dated December 17, 1982, and the prescription bills.

█ Both parties agree that the law in Illinois is that unless the nature and extent of damages can be proven with reasonable certainty, the award cannot be sustained. (*DMI, Inc. v. Country Mutual Insurance Co.* (1980), 82 Ill. App. 3d 113, 402 N.E.2d 805.) There must also be a causal connection between the injury sustained and the event in question that is proven with a degree of probability that amounts to reasonable certainty. (*Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 229 N.E.2d 171.) As to plaintiff's exhibit number 4, the record indicates that Dr. Das hospitalized plaintiff for back pain on December 17, 1982, and plaintiff remained in the hospital through December 22, 1982. Between the date of the accident and the time of plaintiff's hospitalization by Dr. Das, plaintiff had inhaled toxic fumes. While Dr. Das did agree that the toxic fumes could or might contribute to some of the complaints of a muscular skeletal nature made by plaintiff, Dr. Das testified that he treated plaintiff for inhalation of toxic fumes only until June 8, 1982.

█ We believe plaintiff did establish a causal connection between his hospital stay and the injuries he sustained in the 1980 auto accident by Dr. Das' testimony. Defendant did not establish any causal connection between plaintiff's hospital stay and the inhalation of toxic fumes. While Dr. Naguit testified that he thought plaintiff's back injury was healed by May 17, 1980, he did tell plaintiff to seek treatment if his back began to bother him. All doctors testified that the nature of a back injury is such that painful symptoms can reoccur.

As to plaintiff's exhibits 6 through 13, plaintiff testified that he had bought all prescriptions which had been prescribed for him by his doctors for his back injuries. Dr. Naguit testified that he had prescribed various drugs to alleviate plaintiff's pain as well as relax plaintiff's muscles from February 26 through May 17, 1980. Further,

he did tell plaintiff to seek treatment if his back began to bother him again. Dr. Das testified that he prescribed numerous and various medications between 1981 and 1986. This, too, we believe, was enough to make a causal connection between the accident in question and the prescriptions. The opinion of Dr. Das that plaintiff's back injuries were caused as a result of the 1980 auto accident was a proper method of proving causal connection.

The instant case is similar to *Turner v. City of Chicago* (1968), 95 Ill. App. 2d 38, 238 N.E.2d 100, cited by plaintiff. In *Turner*, a *prima facie* showing of damages was made by the plaintiff by his testifying to pain and suffering in connection with his fall on a city sidewalk, to medical treatment he received, and to lost wages. The *Turner* court held that once the plaintiff made a *prima facie* showing of damages, the city had the burden of going forward with evidence to show that the plaintiff was not injured on its sidewalk. Likewise, in the instant case, once plaintiff testified to his pain and suffering, medical treatment sought, and lost wages, it was up to defendant to prove that such injuries were not a result of the 1980 auto accident.

Defendant cites *Chapman v. Powers* (1975), 30 Ill. App. 3d 44, 331 N.E.2d 593, in which a hospital bill was improperly admitted into evidence since there was no medical testimony to establish that the charge was reasonable or that the entire bill was related to the injury claimed; in *Chapman*, however, the court found that this was not prejudicial error. The instant case is also distinguishable from *Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 229 N.E.2d 171, also cited by defendant. In *Manion*, a verdict in favor of the executrix of the decedent was not sustainable where an autopsy showed death resulted from degenerative diseases, none of which could be directly attributed to the traumatic injuries sustained by the decedent in an auto accident. In the case at bar, Dr. Das specifically stated that it was his opinion that plaintiff's complaints were consistent with plaintiff's injury from the February 20, 1980, auto accident.

Between plaintiff's testimony, Dr. Naguit's testimony, and Dr. Das' testimony, we cannot say that there was not a causal connection between the hospital bill and the prescription bills to support the jury's verdict.

■ The third issue to consider is whether the trial court erred when it gave plaintiff's jury instruction number 14, which instructed the jury as to five elements of damages. Defendant argues that the instruction was improper because the elements of damages set forth in the instruction were not supported by the evidence. Plaintiff replies that the five itemized elements of damages contained in plaintiff's in-

struction number 14 were proven with reasonable certainty.

It is well settled that the nature and extent of damages must be proven within reasonable certainty to sustain the award. (*DMI, Inc. v. Country Mutual Insurance Co.* (1980), 82 Ill. App. 3d 113, 402 N.E.2d 805.) Further, it is reversible error to instruct the jury on issues upon which no evidence has been produced. *Connolly v. Melroy* (1978), 63 Ill. App. 3d 850, 380 N.E.2d 863.

The first element instructed the jury to compensate plaintiff for aggravation of any preexisting ailment or condition. Dr. Naguit testified under cross-examination that the degenerative changes found in plaintiff preexisted the February 20, 1980, accident. Further, plaintiff, under cross-examination, testified that Dr. Das had told him he had arthritis in his back prior to the accident and the "force of the collision broke it loose." Otherwise, the arthritic condition would have remained dormant. Defendant's own cross-examination of these two witnesses presented sufficient evidence to support the jury's award of damages for aggravation of a preexisting condition.

The second element instructed the jury to compensate for disability resulting from the injury. Dr. Naguit testified that plaintiff was injured as a result of the February 20, 1980, auto accident, although he also testified that he believed plaintiff had completely recovered by May 17, 1980. Dr. Naguit clearly restricted plaintiff's movements after the accident as Dr. Naguit testified he told plaintiff he could return to work on May 19, 1980. Dr. Das testified that plaintiff's prognosis is poor, while plaintiff himself testified that he believed his back was deteriorating. Further, plaintiff and plaintiff's wife testified plaintiff has continuing pain and difficulty maneuvering which have impinged upon his lifestyle. We find this to be sufficient evidence to instruct the jury as to disability.

In addition to defendant's argument that the first two elements were not supported by the evidence, defendant argues that the aggravation and disability elements are duplicative and allowed a double recovery. Defendant cites no law to support his proposition that the elements of aggravation of any preexisting condition and the disability resulting from the injury are duplicative elements of damages. Supreme Court Rule 341(e)(7) provides that the appellant shall include in the argument portion of his brief the citations and authorities relied on by appellant in advancing said argument. (107 Ill. 2d R. 341(e)(7).) This provision is simply an application of the general principle that the court will not research and argue a case for an appellant. Where there is failure to cite authorities in connection with an argument, the argument may be rejected for that reason. (*Nicholl v. Scaletta* (1982),

104 Ill. App. 3d 642, 432 N.E.2d 1267.) In this instance, however, common sense alone dictates that the two elements, aggravation and disability, are mutually exclusive.

The third element instructed the jury to compensate plaintiff for pain and suffering experienced and reasonably certain to be experienced in the future as the result of the injuries. Again, the testimony of plaintiff's treating physicians concerning plaintiff's injury and treatment, Dr. Das' poor prognosis, and plaintiff's wife's testimony as to plaintiff's pain and suffering are sufficient to allow the inclusion of this element in the instruction.

The fourth element instructed the jury to compensate plaintiff for the reasonable expense of necessary medical care, treatment and services received and the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future. The evidence of plaintiff's existing medical expenses came from bills from Memorial Hospital incurred the day after the accident, bills for physical therapy prescribed by Dr. Naguit, bills from Memorial Hospital for plaintiff's 1982 admission, and bills for doctors' care as well as bills for prescriptions. While there was no medical opinion as to the amount of expenses plaintiff would require for future medical treatment, Dr. Das did testify that plaintiff's prognosis is poor. Further, plaintiff testified that his back condition is deteriorating. Given the evidence concerning the nature of plaintiff's disability, the jury could reasonably infer that future medical expenses would be incurred. *Levin v. Welsh Brothers Motor Service, Inc.* (1987), 164 Ill. App. 3d 640, 518 N.E.2d 205.

The fifth and final element instructed the jury to compensate plaintiff for the value of earnings and profits lost and the present cash value of earnings reasonably certain to be lost in the future. Plaintiff's tax returns for the years 1979 through 1983 were introduced to prove lost income. Further, plaintiff testified that after the accident in question he was forced to scale down his fence business to the point of ultimate sale because he was no longer able to do the physical labor required of him by such a business.

In summary, we find there was sufficient evidence presented to instruct the jury as to all five elements of damages. Likewise, there was sufficient evidence to support a recovery on each element. It is the jury's function to weigh contradictory evidence, to judge the credibility of the witnesses, and to draw ultimate conclusion as to the facts, and the jury's conclusion should not be set aside merely because different conclusions could be drawn from the evidence. *Finley v. New York Central R.R. Co.* (1960), 19 Ill. 2d 428, 167 N.E.2d 212.

■ The fourth issue raised by defendant is whether the trial court erred when it refused to direct a verdict on behalf of defendant and against plaintiff at the close of plaintiff's case and at the close of all the evidence. Defendant argues that plaintiff's case against him is based solely on the contention that defendant was operating the vehicle which struck plaintiff, although there is no evidence to even establish that defendant's vehicle was the same vehicle involved in the accident. Defendant argues that there are "glaring discrepancies" in plaintiff's description of the vehicle involved in the accident and the actual characteristics of defendant's vehicle. Further, assuming, *arguendo*, that defendant's vehicle was involved in the accident with plaintiff on February 20, 1980, defendant is still entitled to a directed verdict, according to defendant, because plaintiff did not prove defendant was the driver of the truck. According to defendant, if it is proven defendant's vehicle was the same vehicle involved in the accident, the presumption would arise that defendant is the driver. However, defendant rebutted the presumption by testimony that he was not operating his vehicle at the time of the accident. The burden of proving defendant was the driver still remained with plaintiff, according to defendant. Plaintiff presented no evidence to support his allegation that defendant was the driver; therefore, plaintiff failed to meet his burden of proof and defendant was entitled to a directed verdict.

The general rule in automobile injury cases is that proof of ownership raises a presumption that the machine was under defendant's control at the time of the accident, and the burden of rebutting this inference then passes to defendant. (*Robinson v. Workman* (1956), 9 Ill. 2d 420, 427, 137 N.E.2d 804, 808; *McElroy v. Force* (1968), 38 Ill. 2d 528, 532, 232 N.E.2d 708, 710.) Illinois has generally followed the prevailing view that a presumption ceases to operate in the face of contrary evidence. Where there is absence of evidence to the contrary, however, the *prima facie* case created under a rebuttable presumption will support a finding. (*Diederich v. Walters* (1976), 65 Ill. 2d 95, 102, 357 N.E.2d 1128, 1131; *McElroy v. Force* (1968), 38 Ill. 2d at 533, 232 N.E.2d at 711.) In *Diederich v. Walters*, Dean Wigmore's view on this issue was adopted. Wigmore states:

" '[T]he peculiar effect of a presumption "of law" (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent. If the opponent *does* offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule

\*\*\*.' (9 Wigmore, Evidence sec. 2491, at 289 (3d ed. 1940) [now Chadbourn rev. 1981 at 305].)" (Emphasis in original.) (65 Ill. 2d at 101, 357 N.E.2d at 1131.)

Clearly, defendant must offer evidence sufficient to satisfy the trial judge's requirement that *some* evidence has been presented to overcome the presumption.

■ In the instant case, we believe there was sufficient evidence to establish that defendant's truck was in the collision with plaintiff's vehicle. Not only did plaintiff give an accurate description of defendant's vehicle, but the license number provided by plaintiff matched defendant's vehicle. The presumption that defendant was involved in the accident was established. Defendant testified that he had never been on Shiloh Road and was not there on February 20, 1980. Defendant further testified that in February 1980, he had seen a truck in the Collinsville area that was similar to his, but defendant could not produce a license plate number. Defendant's mother, Patricia Gumm, testified that she had used defendant's truck on February 20, 1980, to return a Roto-Rooter. She produced a copy of the receipt dated February 20, 1980. She further testified that she was in possession of defendant's truck until 1:30 p.m.; however, on cross-examination, defendant's mother admitted she did not use the truck after noon. Defendant's wife, fiancee at the time of the incident, testified to her normal habits during the month of February 1980. She testified that she normally went to defendant's house from approximately 12:15 to 12:45 p.m. to eat lunch with defendant. This testimony favoring defendant was sufficient to satisfy the "some evidence" requirement and put this matter in the jury's hands for resolution. On the evidence recited above, the jury could reasonably infer that defendant's truck was involved in the collision.

In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the supreme court stated the following standard to determine whether a trial court should enter a directed verdict.

"In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d at 510, 229 N.E.2d at 513-14.)

In applying the *Pedrick* standard to the facts presented here, we find that the trial court did not err when finding that all the evidence, when viewed in the light most favorable to plaintiff, did not so overwhelmingly favor defendant that no contrary verdict could ever stand.

As to defendant's argument regarding an agency relationship, we need not address this issue, as plaintiff did not contend anyone other than defendant was driving the vehicle involved in the collision with plaintiff.

Defendant's fifth issue on appeal is whether the trial court erred when it permitted plaintiff and his wife to testify regarding their financial status, introduced into evidence the testimony that plaintiff had to return to work because of lack of income and refused to grant defendant's motion for a mistrial. Defendant argues that references to plaintiff's familial and financial status were made by plaintiff, plaintiff's wife, and plaintiff's counsel at various times during the trial and such references were so harmful and prejudicial as to have resulted in an improper and excessive verdict for plaintiff. Defendant argues that said references constituted reversible error.

The record reveals that during plaintiff's opening statement, plaintiff's counsel made a statement that plaintiff was working only because of his poor financial condition. Defendant moved for a mistrial based on plaintiff's counsel's remarks. Defendant's motion was denied. Next, plaintiff was permitted to testify over defendant's objection that he was working at the time of the trial because he had no other way of supporting his wife and family. The following remarks were made:

"Q. [by plaintiff's attorney]: But yet you are employed?

A. Yes, I am, against the doctor's—

MR. DUCEY: Show an objection.

THE COURT: That will be sustained.

Q. [by plaintiff's attorney] You are presently employ[ed], however?

A. Yes, I am.

Q. Mr. Scheibel, if you feel that you are unable physically to perform your normal livelihood, why is it that you, in fact, are working?

Q. My—

MR. DUCEY: Show an objection. This is irrelevant.

THE COURT: It's overruled. You may answer.

A. I have no other way of supporting myself and my family."

Plaintiff's wife also gave unsolicited testimony that plaintiff was working because of financial necessity, but defendant's objection was sustained. Plaintiff's wife also testified without objection as to how plaintiff's injuries have affected plaintiff's family.

References to the financial status of the parties may consti-

tute reversible error. (*Lake County Forest Preserve District v. Continental Illinois National Bank & Trust Co.* (1976), 35 Ill. App. 3d 942, 343 N.E.2d 6.) However, the language complained of must not only reasonably be understood to refer to the financial status of one of the parties, but it must also be shown that it was so harmful and prejudicial as to have resulted in the return of an improper verdict. *McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 481 N.E.2d 787.

■ In the instant case, the trial court correctly sustained defendant's objection to plaintiff's wife's unsolicited comments about plaintiff's financial status, and we find no error. Plaintiff's counsel's remarks during opening statements were in error; however, we find these statements were not so harmful and prejudicial as to constitute reversible error. Likewise, plaintiff's statements about his financial and familial status were not so prejudicial as to constitute reversible error. Many people, including those who are not hurt in an accident, would rather not be working, but are made to do so to support their families. Further, the opening statement and the questioning complained of does not constitute a significant portion of the evidence taken at trial. (*McMahon*, 135 Ill. App. 3d 211, 481 N.E.2d 787.) Additionally, this record contains more than sufficient information to support the jury's verdict. For the foregoing reasons, and in light of the jury's reduction of the award by 50% for plaintiff's contributory negligence, we are satisfied that the failure of the trial court to sustain defendant's objections was harmless error.

■ Defendant's sixth issue on appeal is whether the trial court erred when it barred defendant from introducing the testimony of Dr. Simon Hornstein and F.J. Accardio. Defendant specifically argues that Dr. Hornstein was an examining physician pursuant to Supreme Court Rule 215 (107 Ill. 2d R. 215). His report was furnished to plaintiff pursuant to Rule 215 on February 6, 1985. Thus, Dr. Hornstein's examination and findings were well known to all parties prior to trial, and under Rule 215, Dr. Hornstein should have been permitted to testify. Defendant argues that Rule 215, not Rule 220, is the applicable provision in this case because it is the specific rule, while Rule 220 is merely a general rule. Additionally, defendant argues that by complying with Rule 215, defendant in effect complied with Rule 220 in that the information to be provided under Rule 220 is in fact provided when complying with Rule 215. Finally, defendant argues the testimony of an expert witness can only be barred by the trial court if a party fails to comply with a court order setting forth deadlines for disclosure of experts. Defendant argues that the trial court never entered an order

regarding the disclosure of experts, so the trial court had no authority to bar Dr. Hornstein's testimony.

The trial court also barred the testimony of Dr. Hornstein and F.J. Accardio because they had not been disclosed as a witness expected to testify at the time of *voir dire* of the jury. On September 17, 1986, during *voir dire*, the court requested both parties to name all witnesses expected to testify at trial. Defendant did not name either Dr. Hornstein or F.J. Accardio. Defendant argues that the trial court had no authority to bar either witness because, according to defendant, there is no law or procedure in Illinois which allows the trial court to do so. Without these two witnesses' testimony, defendant argues he was denied his right to a fair trial.

The record reveals that on or about August 11, 1986, plaintiff filed and served upon defendant Rule 220 interrogatories requesting the names of any expert witness expected to testify at trial. On August 19, 1986, defendant filed his answers to the Rule 220 interrogatories stating, "[t]his defendant has no expert witnesses at this time which it intends to call at the trial of this case." Dr. Hornstein did examine plaintiff pursuant to Supreme Court Rule 215, and his report was furnished to plaintiff on February 6, 1985.

Supreme Court Rule 220(b)(1) requires the disclosure of an expert witness at the later of either the first pretrial conference or 90 days after the substance of his expert opinion is known to the party who intends to introduce such witness. The rule further provides that failure to disclose an expert as required will result in disqualification of the expert. (107 Ill. 2d R. 220(b)(1).) The trial court may impose sanctions, and the court's decision should not be interfered with on review absent a clear showing of abuse. *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 497 N.E.2d 1022; 107 Ill. 2d R. 219.

In the instant case, we can find no order scheduling the date upon which all expert witnesses were to be disclosed. It is clear, however, that defendant did not disclose any experts before trial, and defendant stated on August 19, 1986, only one month before trial, in his answer to plaintiff's interrogatories that he did not intend to call any expert witnesses. Immediately before trial, during *voir dire*, the trial judge specifically asked defendant what witnesses he intended to call, and both Dr. Simon Hornstein and F.J. Accardio were absent from defendant's list. Clearly, defendant did not act in good faith to identify expert witnesses, as required by Supreme Court Rule 220. Defendant's offer of proof on F.J. Accardio indicates he would have testified as an expert. If Mr. Accardio had been allowed to testify, defendant's attorney said he would have stated "that he examined the

automobile in May of 1980, or truck in 1980, and at that time there was—he found there was no damage to the truck and there had never been any repairs made to the truck. The front of the truck, which would have been an area involved in this accident."

The application of the sanction to disqualify an expert is within the sound discretion of the trial court. *Romano v. Bittner* (1987), 157 Ill. App. 3d 15, 510 N.E.2d 924; *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 497 N.E.2d 1022; *Appelgren v. Walsh* (1985), 136 Ill. App. 3d 700, 483 N.E.2d 686.

Defendant cites no authority for his argument that by disclosing Dr. Hornstein under Rule 215, he was not required to disclose Dr. Hornstein under Rule 220. A comparative reading of both rules clearly indicates their differences in focus and intent. Rule 215 deals with medical examinations, providing the mechanism for the examination to take place and assuring timely disclosure of its results. Rule 220 is a comprehensive plan for pretrial disclosure of experts generally. This court in no way reads these two rules as being mutually exclusive.

In considering a situation wherein the parties know the existence of an expert but that expert has not been disclosed or discovery had under Rule 220, we cite the case of *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 497 N.E.2d 1022. In *Fischer*, the plaintiffs agreed that their "last-minute disclosure" (three days before trial) of an expert violated Supreme Court Rule 220. (147 Ill. App. 3d at 172.) The plaintiffs, however, suggested that the rule is flexible because the defendants knew of the witness' presence since the witness had inspected the property and the defendants knew of the report. The *Fischer* court did not agree with the plaintiff's argument and held that the trial court did not abuse its discretion in refusing to allow the plaintiff's expert witness to testify.

Additionally, an expert has been disqualified when his opinion was offered in opposition to a motion for summary judgment, even though at the time of the hearing on the motion for summary judgment, the court-ordered discovery cut off was still one month away and the scheduled beginning of the new trial was three months away. *James v. Yasunaga* (1987), 157 Ill. App. 3d 450, 510 N.E.2d 531.

We believe that the trial court did not abuse its discretion in refusing to allow either Dr. Hornstein or F.J. Accardio to testify. The defense attorney did not act in good faith and the trial court administered an appropriate sanction. To rule otherwise would allow defense attorneys to effectively circumvent Rule 215 through Rule 220.

The final issue on appeal is whether the trial court erred

when it denied defendant's motion to dismiss plaintiff's amended complaint on the basis that plaintiff had assigned all rights and causes of action he may have had to State Farm Insurance Company (State Farm). Defendant argues that because plaintiff entered into a "release and trust agreement" with State Farm, which provided for the assignment of rights of plaintiff to State Farm in consideration for the payment of $5,000, plaintiff assigned his right to *any* claims for personal injuries arising out of the accident on February 20, 1980, to State Farm. According to defendant, State Farm became the real party in interest. Therefore, the trial court erred when it denied defendant's motion to dismiss plaintiff's amended complaint because plaintiff was not a real party in interest, and thus plaintiff lacked standing to sue. Defendant further argues the trial court erred when it denied defendant's motion to require State Farm to be named as a plaintiff on its claim to recover $5,000 which it paid to plaintiff.

If an insured plaintiff has even a *de minimis* pecuniary interest in the lawsuit, that interest is sufficient to allow a subrogation action to be maintained in plaintiff's name. (*Radtke v. International Heater Co.* (1986), 140 Ill. App. 3d 542, 488 N.E.2d 1352.) Here, suit was brought in plaintiff's name to recover less than $50,000. The jury returned a verdict of $100,000 reduced by 50% for contributory negligence. Plaintiff had signed a "release and trust agreement" assigning his rights to State Farm in consideration for $5,000. Obviously, plaintiff did not assign all his rights to his personal injury action to State Farm because such an assignment is void as against public policy in Illinois. (*Wilcox v. Bierd* (1928), 330 Ill. 571, 162 N.E. 170; *North Chicago Street R.R. Co. v. Ackley* (1897), 171 Ill. 100, 49 N.E. 222.) However, subrogation of bodily injury cases, as opposed to an assignment of such cases, is not prohibited by public policy. *Remsen v. Midway Liquors, Inc.* (1961), 30 Ill. App. 2d 132, 174 N.E.2d 7.

We find that the "release and trust agreement" between plaintiff and his insurer, State Farm, was a subrogation agreement which operated only to secure the $5,000 paid to plaintiff by State Farm. We find defendant's argument to be without merit. The trial court was correct to deny defendant's motion to dismiss and to deny defendant's motion to require State Farm to be named as a plaintiff.

For the above-stated reasons, we affirm the judgment of the circuit court of St. Clair County.

Affirmed.

HARRISON and HOWERTON, JJ., concur.