RITA M. RICHTER, Plaintiff-Appellee, v. NORTHWESTERN MEMORIAL
HOSPITAL, Defendant-Appellant (Seymour Diamond *et al.*, Defendants).

First District (2nd Division)   No. 87—1698

Opinion filed October 25, 1988.—Rehearing denied January 12, 1989.

Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll, James K. Horstman, Anthony J. Kiselis, and C. Barry Montgomery, of counsel), for appellant.

Leonard M. Ring & Associates and Concannon, Dillon & Morton, both of Chicago (Leonard M. Ring, Leslie J. Rosen, Margaret A. McGuire, William R. Dillon, and John B. Dillon, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff Rita Richter's personal injury action sought damages for the alleged malpractice of certain doctors and of the Northwestern Memorial Hospital, asserting that Dr. Seymour Diamond and the Diamond Headache Clinic, Ltd. (hereinafter jointly referred to as Diamond), were negligent in failing over the six-year period during which

they were treating her for headaches to diagnose a brain tumor which had to be removed surgically, and that Dr. Edir B. Siqueira, the surgeon who removed the tumor, and Northwestern Memorial Hospital, the facility where the operation was performed, negligently conducted her post-operative treatment, resulting in a stroke.

On October 31, 1986, the jury returned a verdict finding all defendants negligent and jointly and severally liable for Richter's damages in the amount of $15,787,555. On April 20, 1987, the trial court ordered a remittitur of $382,709 because the jury had added that amount for "medical supplies" by writing it in on the itemized verdict form. The court ruled that this item had been properly included under "medical expenses" in the itemized verdict form.

After the court denied the hospital's post-trial motion, and more than six months after judgment, the hospital moved to reduce the judgment by 50% of any collateral source benefits the plaintiff had received. The trial judge issued an order denying the motion as being untimely. In that same order he reduced the amount of the judgment to reflect the prior remittitur and a setoff resulting from the plaintiff's $100,000 settlement with Dr. John H. Buehler, who was dismissed from the case prior to trial. The court also found that the judgment was partially satisfied as a consequence of a $6 million post-trial settlement between Richter and Diamond. In April 1987 Siqueira offered Richter $1 million, the limits of his malpractice coverage. Although plaintiff accepted the money after the hospital's notice of appeal was filed, and thus her acceptance is not of record, the record does reflect Siqueira's offer and the trial court's treatment of it as a credit against the judgment.

To summarize in nontechnical language, Richter suffered from the effects of a developing, but for many years undiagnosed, brain tumor. When the tumor ultimately was discovered, it had developed to such a size that surgery was required to save her life; however, even such radical treatment would result in certain unavoidable injuries. Richter's cause of action against Diamond was based on the theory that the tumor was developing while she was under his care and that he was negligent in failing to diagnose it.

In order to minimize the effects of the developing brain tumor, Richter entered the hospital and had the tumor surgically removed by Siqueira. While convalescing from the operation, Richter contracted pneumonia, which she alleged resulted in bacterial meningitis, and eventually a stroke. Plaintiff's causes of action against Siqueira and the hospital were based on the theory that each of these defendants was guilty of negligent acts or omissions which contributed to her de-

velopment of pneumonia, meningitis, and a stroke.

The chronology of the facts in this case can be divided into two parts. The first period commences on March 27, 1973, when Richter first saw Diamond, and concludes at 8:45 p.m. on February 8, 1979, the time of the hospital's first allegedly negligent act. The second period goes from February 8 to March 17, 1979, the date on which Richter suffered her stroke.

## MARCH 27, 1973, TO FEBRUARY 8, 1979

Richter first saw Diamond March 27, 1973, when she complained of headaches, and had contact with him regarding her problem about 47 times during a period of almost six years. She last visited him on January 8, 1979, during which visit she complained of dizziness and blurred vision. Her last contact with him was on January 25, 1979, when she told him in a telephone conversation that she still had the same ailments, plus neck pain.

On February 2, 1979, Richter saw opthalmologist Dr. Paul Hauser, who diagnosed a severe case of papilledema and referred Richter to her internist, Dr. Buehler. Buehler saw her the next day and suggested immediate admission into the hospital for treatment of a possible brain tumor; accordingly, Richter entered Northwestern Memorial Hospital on February 4, 1979.

Richter was diagnosed two days later as suffering from a large acoustic neuroma, requiring immediate surgical removal. Progress notes prior to surgery indicate that Richter was suffering from a partial loss of hearing in the right ear, a slight facial paralysis on the right side, impairment of the gag reflex, nystagmus of the right eye, partial loss of functioning of the tongue, impairment of vision in the right eye, ataxia, and impaired coordination.

Siqueira surgically removed the tumor during a 12-hour operation on February 8, 1979. The operation and related nerve damage left Richter with total, permanent hearing loss in the right ear, total facial paralysis on the right side, and impairment of the gag reflex and vocal cord paralysis. There was no testimony or allegation that the surgery was either unnecessary or performed improperly; neither is there any dispute as to the fact that Richter had consented to proceed with the operation despite being informed of the concomitant risks. She also continued to suffer from several of her preoperation ailments, as she had been told she would and had consented to, namely, loss of the corneal reflex, nystagmus of the right eye, partial loss of functioning of the tongue, the impairment of vision in the right eye, and ataxia.

FEBRUARY 8, 1979, TO MARCH 17, 1979

According to Richter, the hospital was first negligent on February 8, 1979, at 8:45 p.m., when Dr. Fred Lang, an anesthesiology resident and a member of the Respiratory Care Physicians Service, removed an endotracheal tube from Richter. She alleges that this first post-operative extubation made it more likely that she would aspirate foreign contents into her lungs and develop pneumonia. She was reintubated on February 9 at 1:45 a.m.

That same day at 7:20 a.m., Dr. George Katele, an anesthesiology resident and also a member of the Respiratory Care Service, extubated Richter for the second time, and she remained so until intubated for a third time that evening. The third extubation was performed by Katele on February 10, 1979, at noon, but the tube was inserted once more less than two hours later, at 1:45 p.m. Richter remained intubated until February 13, when a tracheostomy tube was placed in her throat, obviating the need for an endotracheal tube, which, accordingly, was removed.

Two days later Richter developed a fever. At approximately 6 p.m. that day Dr. Frank P. Shinco, a neurosurgery resident, ordered penicillin for Richter. Plaintiff contends that this drug is effective against only gram-positive bacteria and that a drug effective against gram-negative bacteria should have been administered.

On February 19, 1979, the attending respiratory care physician signed the Respiratory Care Physicians Service off the case. Later that day Richter developed a severe headache and a spiking fever. After receiving test results on February 22, 1979, indicating the presence of E. coli (gram-negative) bacteria in the plaintiff's blood, Siqueira ordered the commencement of intravenous Gentamicin to combat the gram-negative bacteria.

The plaintiff complained of nuchal rigidity, a stiff neck, the next day. Since nuchal rigidity is a sign of meningitis, Siqueira ordered a lumbar puncture, which tested positive for gram-negative bacteria, indicating that Richter might have meningitis. On February 24, after consulting with the Infectious Diseases Service, Siqueira inserted a Ommaya reservoir into the plaintiff's skull to allow the direct inoculation of the cerebral spinal fluid with Gentamicin. On March 9, 1979, Siqueira removed the Ommaya reservoir and replaced it with an external ventricular drainage shunt. On or about March 17, 1979, Richter suffered a stroke which caused, among other things, hemiparesis of her right side; in other words, she has only partial use of her right arm and leg.

Opinion

# I

The hospital's chief contention on appeal is that the damages should have been apportioned among the different parties, rather than awarded in the form of a joint and several verdict as occurred here. The hospital argues that it is well-settled law that damages should be allocated if there is any rational basis for doing so (*Gaunt & Haynes, Inc. v. Moritz Corp.* (1985), 138 Ill. App. 3d 356, 485 N.E.2d 1123; *B.S. Livingston & Co. v. Bethlehem Steel Export Corp.* (1974), 25 Ill. App. 3d 121, 323 N.E.2d 49; *cf. Schomer v. Madigan* (1970), 120 Ill. App. 2d 107, 255 N.E.2d 620; *Martin v. Owens-Corning Fiberglass Corp.* (1987), 515 Pa. 377, 528 A.2d 947), and asserts that there is evidence in this case upon which apportionment could have been attempted.

Richter's response to the hospital's argument regarding the allocation of damages is that the hospital has waived it. She contends that the hospital agreed to "play the game" under one set of rules, and after losing in the trial court, it now wants to replay the game using different rules. The hospital responds that it attempted at the appropriate times to have this case analyzed other than as one involving an indivisible injury, the compensation for which logically must be the joint and several responsibility of the defendants, but that its efforts were spurned by the trial court.

During the instruction conference, the parties discussed Illinois Pattern Jury Instruction No. 41.04 (Illinois Pattern Jury Instructions, Civil, No. 41.04 (2d ed. 1971)) (hereinafter IPI Civil 2d), which provides as follows:

> "If you find that the plaintiff is entitled to recover against more than one defendant, you may not allocate the damages among them, but you must return a verdict in one, single sum against all defendants whom you find to be liable."

Counsel for the hospital objected to this instruction, arguing that there was a basis for allocating damages and that the hospital was not responsible for damages caused by Diamond. The trial court decided to give the instruction over the hospital's objection.

When the instruction conference resumed the following day, counsel for plaintiff raised the following:

> "MR. RING: There is one thing that Mr. Montgomery brought up yesterday that does give me a little room for bringing it up with the Court, and that is the question of Diamond and Northwestern and Siqueira.

\* \* \*

And so the question that I ponder is whether the verdicts that we have should be against Siqueira and Northwestern, and either have a separate verdict form for Diamond or a special finding.

THE COURT: Well, it would be rather difficult to submit a verdict form saying that which really states your theory of the case is that they are jointly responsible, Northwestern and Dr. Siqueira, and then just have to determine on the side whether or not Dr. Diamond is responsible and for how much.

MR. BOLLINGER [counsel for Diamond]: I have been very concerned about this since before the trial started as to how this was going to work out. \*\*\* If I had known we were going to have a case where we were talking about contributory—comparative negligence, I would have put on an entirely different case. \*\*\* I am sort of now left at the end of the trial saying 'Now, we are going to divide up the damages.' I have not put any evidence on relating to how the damages should be divided up.

THE COURT: That's really the difficulty with it is at this juncture, all the proofs are in. And I agree with Mr. Bollinger, that in all likelihood, everyone would have tried it differently if that had been the posture, at least the arguments of respective counsel, including all parties.

\* \* \*

What are the other thoughts on this or objections with respect to having a special finding?

MR. MONTGOMERY [counsel for the hospital]: I take the position, your Honor, that I think there should be a special finding by the jury in terms of what percentage is the sole responsibility of Dr. Diamond, if any.

MR. RING: That's all I ask, that we have one of those.

MR. BOLLINGER: My problem is this: If the jury comes back with a single verdict and Dr. Diamond is not found guilty, we have got no problem.

If on the other hand he is found guilty, it seems then if we are going to do this, we are in essence going to set up a comparative type situation.

Then I want leave to at least have just some bifurcation of this case so that I can put on evidence as to what our opinion is as to what damages should be related to him.

\* \* \*

If we are going to have another mini trial on that issue if the jury comes back against me, I have no objection to this if it will help everybody out.

\* \* \*

MR. RING: That might be another way of doing it, to come back and see.

THE COURT: I think that would probably—that would be proper. That would afford you the opportunity if he is in, to litigate those issues.

\* \* \*

We can let the verdicts stand as they are and consider that separate issue.

\* \* \*

\*\*\* [W]e will proceed with the verdict forms that we have and with the arguments that we have. And I will consider the other things after the jury has returned verdicts in this case."

The jury returned a verdict in favor of plaintiff and against all defendants. After the jurors were polled the judge discharged the jury, without objection from any party.

In denying the hospital's post-trial motion, in which it sought a new trial as to plaintiff's damages, the trial judge stated:

"[T]he parties waived their rights to have an allocation of damages by not making the request at the proper time.

\* \* \*

As NMH [the hospital] states in its post-trial motion, plaintiff's counsel raised the issue of whether there should be an allocation of damages \*\*\* on the day of final arguments. The court gave all parties an opportunity to be heard and to state their respective positions. \*\*\* As the record reflects, the court indicated that it would consider any instructions or verdict forms that might be tendered by any party after the jury returned its verdict based upon the instructions previously tendered. \*\*\* [I]t was announced that [the jury] had reached a verdict \*\*\* [and] the attorneys for the respective parties were then summoned. When the verdict was read and the jurors were polled, all parties were represented by counsel \*\*\* [and] none of the parties requested that the jurors not be dismissed nor did any party submit instructions concerning the allocation of damages or request an opportunity to do so. The jurors were then dismissed without objection."

■ It is well-settled law that failure to make a timely objection in the trial court as to a particular issue constitutes waiver of the

right to raise that issue on appeal. (*E & E Hauling, Inc. v. Pollution Control Board* (1985), 107 Ill. 2d 33, 481 N.E.2d 664; *Brown v. Timpte, Inc.* (1985), 137 Ill. App. 3d 1053, 485 N.E.2d 488; *Hargrove v. Gerrill Corp.* (1984), 124 Ill. App. 3d 924, 464 N.E.2d 1226; *Powers v. Sturm* (1973), 12 Ill. App. 3d 346, 297 N.E.2d 628.) The hospital contends, however, that it is not necessary to repeat an objection each time an issue arises in order to save the question for review, arguing that its objection to the nonallocation instruction was sufficient to preserve that issue for appeal. It also maintains, without citing any authority, that "the post-verdict allocation procedure suggested by appellee [*sic*] is absolutely without authority and would have been improper if undertaken by the court."

■ However, the hospital glosses over the fact that the trial judge and the parties discussed how to resolve the issue of apportioning damages, and the hospital did not object to the procedure adopted by the court. While it happens to be true that a trial judge may not sever the issues of liability and damages over the objection of a party (*Mason v. Dunn* (1972), 6 Ill. App. 3d 448, 285 N.E.2d 191), in this case the hospital plainly agreed to have the jury consider allocation of damages after deciding liability and lump sum damages. The hospital's assertion in the post-trial proceedings that it did not agree to such a procedure is belied by the portions of the transcript we have set forth above in detail, and the hospital fails to rebut, deny or otherwise explain that colloquy.

■ At the time the verdict was returned, none of the parties, including the hospital, objected or brought to the court's attention in any way the fact that the issue of apportioning damages remained to be resolved before the jury was discharged. Where a trial judge reserves a ruling on an issue, it is incumbent upon the interested party or parties to seek a decision or ruling in order to preserve that issue for review. (*Schroeder v. Meier-Templeton Associates, Inc.* (1985), 130 Ill. App. 3d 554, 474 N.E.2d 744; *Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 466 N.E.2d 658; *Gallick v. Novotny* (1984), 124 Ill. App. 3d 756, 464 N.E.2d 846.) Here, the hospital sought to have the damages apportioned, it clearly led the trial judge to believe that it agreed with him that the issue of such allocation would be decided after liability and total damages were determined, and yet it did not pursue that issue at the appropriate time. The trial judge could, with complete justification, conclude at that point that, for whatever reasons best known to the interested parties, the pending business was no longer of any importance to them. The hospital has therefore waived the issue on appeal.

■ We next address the hospital's remaining arguments. It contends that plaintiff's expert, Dr. Austin, was not competent to testify about medical questions concerning respiratory care because his expertise is in neurosurgery, and it also maintains that his testimony regarding plaintiff's extubations was a legally insufficient basis upon which the jury could reasonably have concluded that they were performed negligently. Plaintiff responds that there was testimony that surgery is among the disciplines involved in the field of respiratory care and that decisions regarding the maintenance of the patient's airway were made jointly by the neurosurgery division of the hospital and the Respiratory Care Service. The determination of whether a witness is qualified as an expert is within the sound discretion of the trial court (*Robinson v. Greeley & Hanson* (1983), 114 Ill. App. 3d 720, 449 N.E.2d 250); moreover, the jury determines the weight to be given an expert's testimony and this court finds no basis upon which it should interfere with that determination.

■■ The hospital further argues that Drs. Katele and Lang, anesthesiology residents at the hospital, are not its agents and that it is not responsible for any negligence in the treatment they administered to plaintiff. At trial, plaintiff presented evidence to demonstrate that while the Respiratory Care residents were officially selected and paid by Northwestern University, they were actually employees of the hospital. Whether an agency relationship exists is a factual question which must be determined by the trier of fact (*Barbour v. South Chicago Community Hospital* (1987), 156 Ill. App. 3d 324, 509 N.E.2d 558), and we find that there was sufficient evidence presented at trial for the jury to determine that the hospital had enough control over these two doctors to hold it liable for their malpractice.

■ ■ The hospital's next issue on appeal is that the jury's award was excessive, emphasizing that the jury returned a verdict for exactly the amount requested by plaintiff and that, at the time rendered, the award was the State's largest malpractice judgment. We are not enlightened, however, that these reasons *per se* should imperil any award. At any rate, plaintiff contends that the jury considered that she was 35 years old and a practicing attorney at the time she suffered her injuries, her earning potential, the seriousness of her injuries and the effect they have had on her life, her pain and suffering, and the permanence of her condition in arriving at their verdict. The determination of damages is a matter for the trier of fact (*Lau v. West Town Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63; *Schaffner v. Chicago & Northwestern Transportation Co.* (1987), 161

Ill. App. 3d 742, 515 N.E.2d 298), and a verdict will not be set aside unless it is so excessive as to indicate that the jury was moved by passion or prejudice, or that it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience. (*Hedrich v. Borden Co.* (1968), 100 Ill. App. 2d 237, 241 N.E.2d 546; *Mote v. Montgomery Ward & Co.* (1984), 125 Ill. App. 3d 839, 466 N.E.2d 593.) Given plaintiff's injuries and the damages she suffered in this case, we find the jury's award to be reasonable and should be upheld.

■ The hospital also contends that the trial court erred in refusing to give the following instruction as to mitigation of damages:

"In fixing the amount of money which will reasonably and fairly compensate the plaintiff, you are to consider that an injured person must exercise ordinary care to obtain medical therapy, and the damage resulting from failure to exercise such care cannot be recovered."

It further argues that it should have been permitted to introduce evidence which tended to prove that plaintiff's attorney, rather than her doctor, required that plaintiff's care be provided by registered nurses rather than licensed practical nurses, and that therefore the fees paid to the more highly paid registered nurses were excessive and unreasonable. Plaintiff correctly maintains that there was no evidence that she neglected or refused therapy or medical care and therefore there was no evidence to support an instruction on mitigation. (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266.) She also contends that the question of who suggested that registered nurses care for her is collateral and not relevant to the issues in the case. The determination of relevance in these instances is within the discretion of the trial court and will not be reversed absent a showing of abuse of discretion. (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 464 N.E.2d 751.) No such showing has been made here.

■ Finally, the hospital maintains that the trial court erred in denying its motion to reduce plaintiff's judgment, pursuant to section 2—1205 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1205), which provides in part as follows:

"An amount equal to the sum of (i) 50% of the benefits provided for lost wages or private or governmental disability income programs, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, · and (ii) 100% of the benefits provided for medical charges, hospital charges, or nursing or caretaking charges,

258

which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, shall be deducted from any judgment in an action to recover for that injury based on an allegation of negligence or other wrongful act, not including intentional torts, on the part of the licensed hospital or physician; provided, however, that:

(1) Application is made within 30 days to reduce the judgment."

The hospital filed its motion within 30 days after the trial court denied its post-trial motion, and six months after the jury returned its verdict. It argues that the statute requires a motion to be filed within 30 days of the date of the denial of a post-trial motion, while plaintiff contends that application must be made within 30 days after a verdict is returned. The hospital does not provide this court with a plausible justification for allowing a setoff to be made as late as it claims to be the case, and we cannot assume that the legislature intended to give parties an additional 30 days beyond that provided for filing a post-trial motion to bring to the court's attention a matter which should have been included in such a motion. We hold that the trial court properly ruled that the hospital's motion was untimely.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS* and BILANDIC, JJ., concur.

*Judge Stamos participated in the decision of this case prior to taking office as a supreme court judge.