(Nos. 79254, 79302 cons.—

KEVA RICHARDSON *et al.*, Appellees, v. JEFFREY CHAPMAN *et al.*, Appellants.

*Opinion filed January 30, 1997.*

100

McMORROW, J., joined by FREEMAN, J., concurring in part and dissenting in part.

O'Connor, Schiff & Myers, of Chicago (Elliot R. Schiff, John W. Grove and Mark A. Smith, of counsel), for appellants Jeffrey Chapman, Tandem Transport, Inc., and Carrier Service Co. of Wisconsin, Inc.

Brydges, Riseborough, Peterson, Franke & Morris (Donald G. Peterson, Jay S. Nelson and Terry A. Fox, of

counsel), and Lord, Bissell & Brook (Hugh C. Griffin, Rowe W. Snider, Stephanie A. Burris and R.R. McMahan, of counsel), all of Chicago, for appellant Rollins Leasing Corp.

Corboy & Demetrio, P.C., of Chicago (Philip H. Corboy, Thomas A. Demetrio, Michael K. Demetrio and David A. Novoselsky, of counsel), for appellees.

Robert A. DeHaan and Richard P. Schweitzer, of Zuckert, Scoutt & Rasenberger, of Washington, D.C., for *amicus curiae* Truck Renting & Leasing Association, Inc.

Paul R. Norman and M. Tess O'Brien-Heinzen, of Boardman, Suhr, Curry & Field, of Madison, Wisconsin, for *amicus curiae* Wisconsin Automobile & Truck Dealers Association.

JUSTICE MILLER delivered the opinion of the court:

The plaintiffs, Keva Richardson and Ann E. McGregor, were injured when the car in which they were riding was hit from behind by a truck driven by defendant Jeffrey Chapman in Highland Park. The plaintiffs brought the present action in the circuit court of Cook County against Chapman; his employer, Tandem Transport, Inc., successor to Carrier Service Company of Wisconsin, Inc. (Tandem/Carrier); and Rollins Leasing Corp., which had leased the truck in Wisconsin to Chapman's employer. Following a jury trial, the court entered judgment on verdicts in favor of Richardson and McGregor and against Tandem/Carrier and Chapman. The court later entered judgments against Rollins under the Wisconsin financial responsibility statute for the unsatisfied portions of the two awards. The court also permitted Rollins to obtain reimbursement for

those expenses from Tandem/Carrier on a theory of contractual indemnity. A divided appellate court affirmed all the judgments against the defendants. Nos. 1—91—1736, 1—91—1737, 1—91—3868, 1—92—1221, 1—92—1442 cons. (unpublished order under Supreme Court Rule 23). In addition, the appellate court allowed Rollins' claims for reimbursement from Tandem/Carrier on theories of both contractual and implied indemnity. We granted the petitions for leave to appeal filed by Rollins and by Chapman and Tandem/Carrier (155 Ill. 2d R. 315(a)) and consolidated the causes for purposes of oral argument and disposition.

The accident at issue here occurred in the early morning hours of November 26, 1987, at the intersection of Interstate 94 and Clavey Road in Highland Park. Plaintiff Keva Richardson was the driver of the car, and plaintiff Ann McGregor was a passenger in the vehicle. While stopped at a traffic light, their car was struck from behind by a semitrailer being driven by defendant Chapman. Richardson suffered extensive injuries as a result of the accident and was rendered quadriplegic. McGregor sustained only slight injuries in the accident and has returned to her normal activities. At trial, Richardson introduced extensive testimony concerning her injuries and the expenses she will likely incur in the future as a consequence of the accident. That testimony will be summarized later in this opinion.

The plaintiffs brought the present action against Chapman, Tandem/Carrier, and Rollins. The plaintiffs' second-amended complaint comprised three counts. Count I was against Rollins and alleged that the lessor was vicariously liable for Chapman's negligence under an agency theory. Count II, also against Rollins, alleged that the lessor was liable under the terms of the Wisconsin financial responsibility law. Count III, against Tandem/Carrier and Chapman, was based on common

law negligence. Prior to trial, the judge granted Rollins' motion for summary judgment on count I, and that count is no longer at issue. Count II was severed prior to trial and was not submitted to the jury. The case proceeded to trial on count III alone.

At the close of evidence, the trial judge directed a verdict in favor of the plaintiffs and against Tandem/Carrier and Chapman on the question of liability. Determining only the plaintiffs' damages, the jury returned verdicts against Tandem/Carrier and Chapman and in favor of Richardson and McGregor in the amounts of $22,358,814 and $102,215, respectively. Tandem/Carrier and Chapman, through their insurance carrier, Home Indemnity Company, subsequently tendered $1 million to the plaintiffs in partial satisfaction of the judgments; of that sum, $990,000 was credited to the judgment in favor of Richardson, and $10,000 to the judgment in favor of McGregor. At a later hearing the trial court considered the plaintiffs' claims against Rollins under the Wisconsin financial responsibility statute, and the judge determined that Rollins was liable to the plaintiffs for the portions of the judgments unpaid by Tandem/Carrier and Chapman. The court therefore entered judgment against Rollins and in favor of Richardson for $21,368,814, and judgment against Rollins and in favor of McGregor for $92,215, representing the unsatisfied portions of their awards from Tandem/Carrier and Chapman. Rollins had filed a counterclaim against Tandem/Carrier seeking contractual indemnity, and counterclaims against Tandem/Carrier and Chapman seeking both implied indemnity and contribution. Following a hearing, the trial judge entered judgment in Rollins' favor on the count seeking contractual indemnity but denied the counts seeking contribution and implied indemnity. The judge also entered a finding for contractual indemnity against Chapman, the driver

of the vehicle, though Rollins had not sought recovery from him under that theory.

The appellate court affirmed the judgments entered against Tandem/Carrier and Chapman on the plaintiffs' negligence claims against them, as well as the judgments entered against Rollins on the plaintiffs' statutory claims under the Wisconsin financial responsibility statute. The appellate court rejected the defendants' challenges to the amounts of damages awarded by the jury, and the court also rejected the defendants' arguments that certain trial errors had inflated the verdict returned in favor of Richardson. In addition, the appellate court held that the Wisconsin financial responsibility statute made Rollins liable to the plaintiffs for whatever portions of the judgments were not recoverable from Tandem/Carrier and Chapman. Finally, the appellate court ruled that Rollins could obtain reimbursement from Tandem/Carrier on theories of contractual and implied indemnity; the court did not believe, however, that an action for contribution would lie. The court did not address Rollins' claim against Chapman for implied indemnity.

One member of the appellate panel concurred in part and dissented in part. Justice Cerda disagreed with the majority's interpretation of the Wisconsin financial responsibility statute and would have limited the plaintiffs' recovery under that theory to the amount of the insurance policy filed by Rollins pursuant to the Wisconsin statute. Accordingly, he would also have vacated the judgment in favor of Rollins and against Tandem/Carrier on Rollins' counterclaim for indemnity. In addition, Justice Cerda would have reduced McGregor's award for pain and suffering to $50,000, bringing her total compensation to $52,215.

We allowed petitions for leave to appeal filed by Rollins and by Tandem/Carrier and Chapman. 155 Ill. 2d

R. 315(a). The Truck Renting and Leasing Association, Inc., and the Wisconsin Automobile & Truck Dealers Association were each granted leave to submit briefs as *amici curiae* in support of Rollins. 155 Ill. 2d R. 345.

After we heard oral argument in this case, but before our opinion could be filed, the plaintiffs settled their actions against defendant Rollins for undisclosed amounts. Plaintiff Keva Richardson executed a release and discharge in favor of Rollins on October 1, 1996, and plaintiff Ann McGregor executed a release and discharge in favor of Rollins on October 2, 1996. The plaintiffs and Rollins then submitted to this court a stipulated order for the dismissal of a portion of the claims involved in this appeal. We allowed the order on November 7, 1996, dismissing with prejudice Rollins' appeal from the judgments against it and in favor of the plaintiffs. The question of Rollins' liability to the plaintiffs under the Wisconsin financial responsibility law is therefore no longer before us. The settlements do not affect the plaintiffs' actions against Chapman and Tandem/Carrier, or Rollins' action against Tandem/Carrier for contractual indemnity or its actions against Chapman and Tandem/Carrier for implied indemnity; Rollins may no longer seek contribution from the other defendants, however (see 740 ILCS 100/2(e) (West 1994)).

I

In that portion of the appeal still remaining, Chapman and Tandem/Carrier (defendants) first challenge the amounts of damages awarded to the plaintiffs. The defendants contend that certain errors in the testimony of the economist who appeared at trial in behalf of Keva Richardson inflated the verdict returned in her favor and, further, that the damages awarded by the jury to Richardson and McGregor are excessive.

In their initial challenge to the damages verdicts, the defendants complain of certain testimony introduced

by plaintiff Richardson concerning the calculation of the present value of her future economic losses. The defendants maintain that Professor Charles Linke, who testified as Richardson's economist, improperly used non-neutral, actual figures in describing to the jury the calculation of present cash value. Richardson's life expectancy at the time of trial, in May 1990, was 54.5 years. Relying on information and figures supplied by Richardson's primary physician, Professor Linke testified that the present cash value of her future medical expenses had a lower bound of $7,371,914 and an upper bound of $9,570,034. The lower bound figure assumed a discount rate one percentage point higher than the growth rate; the upper bound figure assumed that the two rates would be equal. The difference between the two numbers was based on different assumptions concerning future growth rates and interest rates. Professor Linke also provided testimony regarding the present cash value of Richardson's lost future earnings. Assuming a work history of 27.5 years, Professor Linke found that the present cash value of Richardson's lost income was between $854,107 and $971,944; using a longer work history of 35.8 years, Professor Linke arrived at a range of $1,068,343 to $1,265,363. Again, the differences between the two ranges were based on the witness' different assumptions regarding future growth and interest rates.

Citing *Allendorf v. Elgin, Joliet & Eastern Ry. Co.*, 8 Ill. 2d 164 (1956), the defendants first contend that Professor Linke was required to use "neutral" figures—amounts having no relation to the damages alleged by the parties—in explaining the concept of present cash value to the jury. In *Allendorf*, a wrongful death action, this court stated:

> "We are of the opinion that the proper method of assisting a jury in making damage calculations is for the actuary to use neutral figures. In the usual situation

where hypothetical inquiries are permissible, it is necessary that the expert assume a factual situation as reflected in the proof in order to insure that his testimony bears upon the issue to be determined. The actuary, however, is called upon only to describe to the jury a mathematical process that will simplify the jury's task of determining the present value of the contribution that plaintiffs would have received had decedent not been killed. To accomplish that purpose it is not necessary that he use figures that correspond with those appearing in evidence, and when he does so there is a danger that the jury may be misled. Once the formula is before the jury, its application to the facts of the case is a matter for argument of counsel." *Allendorf*, 8 Ill. 2d at 177-78.

In the present case, the defendants assert that Professor Linke was not qualified to testify to any specific amounts for Keva Richardson's future medical costs, including those figures provided by Dr. Yarkony, and that his use of the physician's estimates was therefore in error. The defendants would limit Professor Linke's testimony in this regard to the presentation of the appropriate formula for reducing future damages to their present cash value.

As *Allendorf* makes clear, the basis for the neutral-figure requirement expressed in that case was the prohibition against opinions on the ultimate issue. See *Varilek v. Mitchell Engineering Co.*, 200 Ill. App. 3d 649, 672 (1990). Subsequent cases have removed that bar, however, and have determined that a witness, whether expert or lay, may provide an opinion on the ultimate issue in a case. *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545-46 (1995); *People v. Harris*, 132 Ill. 2d 366, 385 (1989); *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 221 (1985); *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill. 2d 118, 122 (1971). The trier of fact is not required to accept the expert's conclusion, and therefore such testimony cannot be said to usurp the province of the jury. *Zavala*,

167 Ill. 2d at 545; *Merchants National Bank*, 49 Ill. 2d at 122. Because the rule against opinions on the ultimate issue no longer has any vitality, we believe that its corollary, which would require the use of neutral figures in presenting the jury with testimony about present cash values, has similarly lost its foundation. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.7, at 571-72 (6th ed. 1994). Deprived of its theoretical footing, the "neutral figure" requirement expressed in *Allendorf* should no longer be followed.

In a further objection to Professor Linke's testimony, the defendants also briefly argue that the economist erroneously included inflation and real growth in reducing Richardson's economic damages to their present cash value. As we have noted, Professor Linke testified to what he termed "lower bound" and "upper bound" figures in computing the future medical expenses and lost earnings. The "lower bound" figure assumed that the prevailing interest rate would be one percentage point higher than the growth rate of wages and prices, while the "upper bound" figure assumed that the two rates would be equal. In this way, Professor Linke attempted to avoid having to predict the exact rates that would prevail; as Professor Linke explained in his testimony, it is not the absolute levels of the interest rate and growth rate that determine present cash value, but the difference between them. *Cf. Baird v. Chicago, Burlington & Quincy R.R. Co.*, 63 Ill. 2d 463, 467-70 (1976) (using differential).

We believe that Professor Linke's methodology was appropriate. In *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199-1200 (7th Cir. 1982), Judge Posner explained the necessity of treating inflation in a consistent manner in reducing an award of future economic damages to present cash value:

"There are (at least) two ways to deal with inflation in computing the present value of lost future wages. One is

to take it out of both the wages and the discount rate—to say to [plaintiff], 'we are going to calculate your probable wage in [the future] on the assumption, unrealistic as it is, that there will be zero inflation between now and then; and, to be consistent, we are going to discount the amount thus calculated by the interest rate that would be charged under the same assumption of zero inflation.' ***

An alternative approach, which yields the same result, is to use a (higher) discount rate based on the current risk-free 10-year interest rate, but apply that rate to an estimate of lost future wages that includes expected inflation. ***

Either approach to dealing with inflation is acceptable (they are, in fact, equivalent) and we by no means rule out others; but it is illogical and indefensible to build inflation into the discount rate yet ignore it in calculating the lost future wages that are to be discounted. That results in systematic undercompensation, just as building inflation into the estimate of future lost earning and then discounting using the real rate of interest would systematically overcompensate."

We conclude that Professor Linke's approach was a reasonable one; by using a differential between the two rates, he did not have to make a prediction of future growth and inflation rates. Professor Linke was consistent in his treatment of inflation, and he did not adopt a method that would undercompensate or overcompensate the plaintiff. See *Varilek v. Mitchell Engineering Co.*, 200 Ill. App. 3d 649, 668-72 (1990); *Stringham v. United Parcel Service, Inc.*, 181 Ill. App. 3d 312, 316-21 (1989).

The defendants next contend that the damages awarded to the plaintiffs are excessive. Before resolving this question, we will briefly summarize the evidence presented at trial regarding the two women's injuries.

Keva Richardson was 23 years old at the time of the accident. She grew up in Pampa, Texas, and received a bachelor's degree in elementary education in May 1987 from Texas Tech University. While in college, she participated in a number of athletic activities and was,

by all accounts, a popular, happy person. After graduating from college, Keva obtained a position as a flight attendant with American Airlines. She planned to work in that capacity for several years before returning to school to gain a post-graduate degree in education; her ultimate goal was to teach. Keva met Ann McGregor in the flight attendant training program, and the two decided to room together upon completion of their training. At the conclusion of the program, they were assigned to the Chicago area, and they had moved there just several days before the accident occurred.

Following the accident, Keva was initially taken to Highland Park Hospital for treatment. Because of the seriousness of her injuries, however, Keva was transferred that morning to Northwestern Memorial Hospital. Dr. Giri Gereesan, an orthopedic surgeon specializing in spinal surgery, determined that Keva had incurred a fracture of the fifth cervical vertebra, which severely damaged her spinal cord and resulted in incomplete quadriplegia. Dr. Gereesan performed surgery on Keva on December 1, 1987, to stabilize her spine so that she would be able to support her head; the surgery did not repair the damage to her spinal cord, and no treatment exists that could do so.

Keva was transferred to the Rehabilitation Institute of Chicago in December 1987, where she came under the care of Dr. Gary Yarkony. Keva was initially dependent on others in all aspects of her daily life. At the Rehabilitation Institute she learned how to perform a number of basic tasks, such as sitting in a wheelchair, transferring from a bed to a wheelchair, brushing her teeth, washing her face, and putting on loose-fitting tops. Keva's initial stay at the Rehabilitation Institute lasted until April 1988, when she moved to her parents' home in Texas. Keva returned to the Rehabilitation Institute in 1988 and in 1989 for follow-up visits. Keva also

required hospitalization in Texas on three subsequent occasions for treatment of conditions arising from the accident.

Testifying in Keva's behalf at trial, Dr. Gary Yarkony, who had served as her primary physician at the Rehabilitation Institute, described Keva's current condition. He explained that she cannot use her legs and that she has only limited functioning in her arms, with loss of control of her fingers and fine muscles in her hands. She suffers pain in her legs and shoulders. Her chest and abdomen are paralyzed, and she has restrictive pulmonary disease. In addition, she has no control over her bladder or bowel functions and requires assistance in emptying them. As a consequence of her physical condition, she is at risk for bladder infections, pneumonia, and pressure ulcers. Keva also suffered a number of facial injuries in the accident. Some of these scars were later repaired through plastic surgery, but others remain.

At trial, Keva's mother, Dixie Richardson, described her daughter's current activities and the level of care necessary to assist her in her daily routine. Keva requires help in taking a shower and getting dressed. She cannot put on underwear, socks, or pants by herself but is able to put on pullover shirts and sweaters. With assistance, she can brush her teeth, apply makeup, and put in her contact lenses. She is unable to cut food or button a sweater. She can push her wheelchair on a smooth, level surface but otherwise needs assistance. In her own testimony, Keva said that she is self-conscious about her appearance now and the impression she makes on others. She said that the thing she misses most is just being able to get up in the morning and begin her day; now she requires the assistance of others, throughout the day.

The jury awarded Richardson a total of $22,358,814

in damages, divided among the following six elements: $258,814 for past medical care; $11,000,000 for future medical care; $900,000 for past and future lost earnings; $3,500,000 for disability; $2,100,000 for disfigurement; and $4,600,000 for pain and suffering. In challenging Richardson's award of damages, the defendants first argue that the sum of the future medical costs found by the jury—$11,000,000—is not supported by the evidence, for it exceeds even the larger of the two figures supplied by Professor Linke, $9,570,034. The defendants contend that the decision to award Richardson nearly $1.5 million more illustrates the jury's failure to properly determine damages in this case.

In response, Richardson argues that the larger award may simply be attributable to the jury's decision to make an award of expenses that she is likely to incur in the future but that were not specifically included in the calculations performed by Professor Linke. Richardson notes that Dr. Yarkony, in compiling for Linke's use the list of likely future medical costs, did not assign specific values to certain items, such as the expenses of future hospitalizations and the costs of wheelchairs and a specially equipped van. Richardson thus argues that the jury's decision to award an amount for future medical costs greater than Professor Linke's higher estimate might simply reflect the jury's desire to compensate her for those unspecified but likely expenses. We agree with Richardson that the trier of fact enjoys a certain degree of leeway in awarding compensation for medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the testimony. See *Scheibel v. Groeteka*, 183 Ill. App. 3d 120, 138 (1989); *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 659-60 (1987). In the present case, however, the amount awarded by the jury for future medical costs is nearly $1.5 million more than the higher of the two

figures claimed at trial by Richardson. Notably, Professor Linke did not rely on the projections by the General Accounting Office (GAO) of the growth of future medical care costs, mentioned in the partial concurrence. Professor Linke explained that the GAO's study included a large number of technology-based items, while the main expense to be incurred by Richardson will be wages for attendant care. Given the disparity between the trial testimony and the jury's eventual award, we will not attribute the entire difference between those sums simply to miscellaneous costs Richardson is likely to incur in the future. For these reasons, we conclude that it is appropriate, by way of remittitur, to reduce by $1 million the nearly $1.5 million differential between the award for Richardson's future medical expenses and the higher figure presented in the testimony. This adjustment allows Richardson recovery for expected future medical costs for which no specific estimates were introduced, yet is not so large that it represents a departure from the trial testimony.

We do not agree with the defendants, however, that the remainder of the award of damages to Richardson, including the sums for pain and suffering, disability, and disfigurement, is duplicative or excessive or lacks support in the record. The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court. See *Lau v. West Towns Bus Co.*, 16 Ill. 2d 442, 452-53 (1959); *Marchese v. Vincelette*, 261 Ill. App. 3d 520, 529-30 (1994). An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience. *Richter v. Northwestern Memorial Hospital*, 177 Ill. App. 3d 247, 257 (1988). When reviewing an award of compensatory damages for

a nonfatal injury, a court may consider, among other things, the permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries. *Marchese*, 261 Ill. App. 3d at 530.

Here, it was the jury's function to consider the credibility of the witnesses and to determine an appropriate award of damages. We cannot say that the present award to Richardson is the result of passion or prejudice, "shocks the conscience," or lacks support in the evidence. The record shows that Richardson suffered devastating, disabling injuries as a consequence of the accident. The defendants urge us to compare Richardson's damages with amounts awarded in other cases. Courts in this state, however, have traditionally declined to make such comparisons in determining whether a particular award is excessive (see *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1065 (1994); *Northern Trust Co. v. County of Cook*, 135 Ill. App. 3d 329, 335 (1985)), and we do not believe that such comparisons would be helpful here.

The defendants also contend that the jury's award of damages to Ann McGregor is excessive. McGregor was 22 years old at the time of the accident. She grew up in Houston, Texas, and graduated from Southern Methodist University in May 1987 with a degree in psychology. Like Keva Richardson, McGregor was accepted after graduation for a position as a flight attendant with American Airlines. As mentioned earlier, the two women met while enrolled in the flight attendant training program and were sharing an apartment in the Chicago area at the time of the accident. Following the accident, McGregor was taken to Highland Park Hospital, where she was treated and released that day; she was then off work for about two weeks. A laceration she

suffered on her forehead eventually healed, with only minimal scarring. At trial McGregor testified that she continues to suffer from nightmares about the accident. The jury awarded McGregor a total of $102,215 in damages, divided among the following components: $1,615 for past medical expenses, $600 for lost earnings, and $100,000 for pain and suffering.

Like the dissenting justice below, we believe that the award of $100,000 for pain and suffering is, in these circumstances, excessive. McGregor was not seriously injured in the accident, incurring a laceration on her forehead, which left only a slight scar. The jury declined to award McGregor any compensation for disfigurement; rather, the bulk of her recovery consisted of compensation for pain and suffering. We conclude that a more appropriate figure for pain and suffering would be $50,000, which would reduce her total damages to $52,215. By way of remittitur, we accordingly reduce the judgment entered in favor of McGregor and against Tandem/Carrier and Chapman to that amount.

## II

With Rollins having settled with the plaintiffs the question of its liability to them under the Wisconsin financial responsibility law, we now consider Rollins' claims against Chapman and Tandem/Carrier. Rollins had previously sought contractual indemnity from Tandem/Carrier, and implied indemnity and contribution from Chapman and Tandem/Carrier. Any right that Rollins might have had to obtain contribution from the other defendants has been extinguished by its settlement with the plaintiffs. 740 ILCS 100/2(e) (West 1994). Remaining before us, then, are Rollins' action against Tandem/Carrier for contractual indemnity, and its actions against Tandem/Carrier and Chapman for implied indemnity.

Both the trial judge and the appellate court con-

cluded that Rollins could seek indemnity from Tandem/Carrier under the terms of the truck rental agreement between Rollins and Tandem/Carrier. We agree, and conclude that Rollins is entitled to contractual indemnity from Tandem/Carrier. A review of the pertinent provisions of the agreement demonstrates Rollins' right to that relief. Paragraph 4 of the terms and conditions of the lease agreement between Rollins and Tandem/Carrier provides that the lessee:

> "SHALL INDEMNIFY AND SAVE ROLLINS HARMLESS WITH RESPECT TO ANY AND ALL INJURY OR DAMAGE TO PERSONS OR PROPERTY ARISING OUT OF OWNERSHIP, MAINTENANCE, USE AND/OR OPERATION OF THE VEHICLE[.]"

In addition, paragraph 6(f) of the terms and conditions provides that the lessee agrees to indemnify Rollins from

> "Claims or causes of action for death or injury to persons, or loss or damage to property in excess of the limits of liability insurance provided pursuant to this lease."

As the appellate court concluded, the plain language of the lease agreement grants Rollins the contractual right to seek indemnity from Tandem/Carrier for personal injury damages. Under the preceding provisions, Rollins may obtain indemnity from Tandem/Carrier for the amount in excess of the $1 million insurance policy provided under the rental agreement.

Tandem/Carrier argues, however, that another provision in the lease agreement establishes that the contractual indemnity provisions were not operative in this case. The provision cited by Tandem/Carrier appears on the front side of the rental agreement, following a list of optional forms of insurance coverage made available to lessees, and it states:

> "IF RENTER DECLINES ANY OF THE ABOVE COVERAGES, HE SHALL BE BOUND TO THE CONDITIONS DETAILED ON THE REVERSE SIDE."

Because Tandem/Carrier accepted coverage in this case, Tandem/Carrier argues that the indemnity provisions

are not applicable here. Tandem/Carrier believes that it would now be bound by the conditions on the reverse side of the agreement, including the indemnity provisions of paragraphs 4 and 6(f), only if it had declined the offer of insurance coverage. We do not agree.

As an initial matter, we believe that Tandem/Carrier's interpretation of the agreement is refuted by paragraph 6(f), which contemplates that a renter could both obtain insurance and have a contractual duty to indemnify the vehicle owner. Paragraph 6(f) requires a renter to indemnify the owner for "Claims or causes of action for death or injury to persons, or loss or damage to property in excess of the limits of liability insurance provided pursuant to this lease." Thus, by the plain language of paragraph 6(f), the duty to indemnify exists even if the renter accepts an offer of insurance.

Moreover, Tandem/Carrier's interpretation of the agreement proves too much. Under Tandem/Carrier's view, none of the provisions on the reverse side of the rental agreement would take effect if the lessee declined the offer of insurance coverage. This could not have been the parties' intention, however. The reverse side of the agreement contains a number of provisions that are unrelated to insurance coverage and that are seemingly applicable whether or not a lessee accepts coverage. For example, one of the terms and conditions on the reverse side states that the rented vehicle is the property of Rollins. We do not believe that the applicability of that provision depends on whether the vehicle lessee accepts or declines insurance coverage. We believe instead that the import of the language cited by Tandem/Carrier is simply to refer lessees to a particular provision on the back of the agreement, applicable when insurance coverage is refused, requiring the lessee in that event to obtain its own policy under which Rollins is an additional insured.

Tandem/Carrier also briefly argues that contractual indemnity is unavailable here because the agreement does not expressly allow indemnity for liability imposed pursuant to statute, which is the basis for the plaintiffs' claims against Rollins. The indemnity provisions are broadly written, however, and do not restrict the availability of the remedy in the manner suggested. We thus conclude that Rollins may obtain indemnity from Tandem/Carrier under the terms of the parties' lease agreement. In the wake of the plaintiffs' settlements with Rollins, we afforded Rollins, Tandem/Carrier, and Chapman the opportunity to submit additional briefs on the potential effect of the settlements on Rollins' claims against the other defendants. With regard to the action for contractual indemnity, Tandem/Carrier has rested on its original briefs in this appeal and does not argue that the settlement affects Rollins' right to obtain indemnity under the lease agreement.

Although our resolution of Rollins' contractual indemnity claim against Tandem/Carrier renders moot Rollins' separate claim against Tandem/Carrier for implied indemnity, our inquiry is not at an end, for Rollins sought indemnity from Chapman, the driver of the truck and not a signatory to the rental agreement, only under an implied theory. We believe that Rollins is entitled to indemnity on this additional ground. In *Frazer v. A.F. Munsterman, Inc.*, 123 Ill. 2d 245, 261-64 (1988), and *Thatcher v. Commonwealth Edison Co.*, 123 Ill. 2d 275, 278 (1988), this court concluded that implied indemnity was not available in a products liability action in which the party seeking indemnity was negligent or otherwise at fault in causing the underlying loss. Later, in *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 154 Ill. 2d 347, 354 (1992), we held that the enactment of the Contribution Act did not abolish common law actions for implied

indemnity in quasi-contractual relationships involving vicarious liability. See also *Faier v. Ambrose & Cushing, P.C.*, 154 Ill. 2d 384 (1993) (in legal malpractice action against two attorneys, first attorney, who settled with plaintiff, allowed under *American National Bank* rationale to pursue claim for implied indemnity against second attorney; second attorney, and not first attorney, had worked on specific matter giving rise to malpractice action, while first attorney handled separate aspect of case, and first attorney had merely introduced plaintiff, his client, to second attorney).

Although the releases executed by the plaintiffs in favor of Rollins speak broadly and are not explicitly limited to actions under the Wisconsin statute, we do not believe that Rollins is precluded from obtaining indemnity because it may be negligent or otherwise at fault, as Chapman contends. Rather, the present claim for implied indemnity fits within the rule expressed in *American National Bank*. The judgments obtained by the plaintiffs against Rollins were based entirely on Rollins' alleged duty under the Wisconsin financial responsibility law. We note, moreover, the presence of a preoccurrence relationship of lessor/lessee between Rollins and Tandem/Carrier, Chapman's employer, a circumstance in which an implied right of indemnity has been found. See *Kerschner v. Weiss & Co.*, 282 Ill. App. 3d 497, 503-04 (1996). Just as Rollins would, in these circumstances, possess a right of implied indemnity against Tandem/Carrier, so too do we believe that Rollins may assert the same right against Chapman, who was Tandem/Carrier's agent. Here, the indemnity defendants make no argument that an implied right of indemnity against the lessee would not also be effective against the driver. In the present case, Rollins is liable not because of anything it did or failed to do, but solely as a consequence of Chapman's negligence, and of the

lower courts' interpretations of the Wisconsin statute, an issue not now before us. Rollins was not negligent or otherwise at fault in causing the loss, and Chapman has not explained why the settlement should deny Rollins a right to implied indemnity; thus, we conclude that it is appropriate to permit Rollins to obtain implied indemnity in this case.

* * *

For the reasons stated, the judgment of the appellate court is affirmed in part, reversed in part, and vacated in part, and the judgment of the circuit court of Cook County is affirmed in part, reversed in part, and vacated in part. Pursuant to the authority of Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), we affirm the judgments entered in favor of plaintiffs and against Tandem/Carrier and Chapman in their reduced amounts. In the absence of consent to the entry of a remittitur by each plaintiff within 21 days of the filing of this opinion or any further period in which the mandate is stayed, her individual action will be remanded to the circuit court of Cook County for a new trial on the question of damages. Otherwise, this cause is remanded to the circuit court of Cook County for entry of judgment on Rollins' claim for indemnity in an amount consistent with this opinion and the settlement between plaintiffs and Rollins.

*Judgments affirmed in part, reversed in part,*
*and vacated in part;*
*cause remanded.*

JUSTICE McMORROW, concurring in part and dissenting in part:

I concur in the opinion of my colleagues in all but one respect: I do not agree with the majority that it is proper to order a remittitur of the jury's award of damages to Keva Richardson for present cash value of future

medical expenses or the jury's award to Ann McGregor for pain and suffering.

In determining the total verdict awarded to Richardson, the jury considered extensive evidence relating to six separate components of damages. As noted by the majority, Richardson "suffered devastating, disabling injuries." The appellate court majority's unpublished opinion describes her condition:

> "After the collision, doctors determined that the communication connection between Richardson's brain and the rest of her body had become severed and she was rendered a quadriplegic. Richardson was soon placed in traction with tongs affixed to her skull by driving screws into the side of her head. She was also placed in a roto-rest bed with 25 pounds weights attached to her body for traction. Eventually, Richardson underwent surgery to stabilize her spine so it could support the weight of her head which hung like a rag doll's head. In that operation, bone from her hips was grafted to her cervical spine with the use of metal plates and screws. The surgery did not repair the injury to Richardson's spinal cord, nor does medical technology yet exist to rectify the injury."

Other evidence related Richardson's need for assistance every six hours to empty her bladder by catheterization and daily assistance to empty her bowel, over which she permanently lacks control. She has lost the use of her legs, fingers, and the fine muscles of her hand. Her chest and abdomen are paralyzed. She is subject to risk of serious infections and other conditions and, according to the evidence, having a child would be life-threatening. The appellate court opinion further stated that Richardson "may expect to be hospitalized on a regular basis for the balance of her life."

The jury awarded $11 million to compensate Richardson for her future medical needs. To this sum the majority applies a remittitur of $1 million, based on the majority's observation that the jury's award for this element of damages exceeded by $1.5 million the testimony

of economist Charles Linke regarding the "upper bound" of the present cash value of Richardson's future medical needs. Linke explained that he calculated a "lower bound present value ($7.4 million) and an upper bound present value ($9.5 million)." His figures were derived from different assumptions regarding the relationship of the rate of interest to the rate of growth. In explaining his economic assumptions and methods, Linke also noted that there were different accounting methods that could be used to calculate Richardson's future medical needs. The one he employed yielded a more conservative figure for medical care than that used by the General Accounting Office, which, according to Linke, would yield the conclusion that "the present value of Keva Richardson's care needs would be approximately 12.1 million dollars."

In assuming that the $9.5 million "upper bound" figure represents the maximum amount that is sustained by the evidence with respect to Richardson's future medical expenses, the majority opinion fails to acknowledge that the information upon which Linke based his calculation of present cash value of future medical expenses represented Richardson's *minimum* care needs for the rest of her life. Dr. Yarkony, upon whose testimony Linke's economic analysis was based, detailed the specific types of medical expenses that Richardson would be expected to need in the coming years. Dr. Yarkony testified, "[T]his is the basic minimum care not covering any hospital admissions for emergencies, complications, and the like." He further testified that in his opinion Richardson would continue to require hospitalizations in the future caused by complications related to her spinal cord injury, including infections, pressure sores, pneumonia, and blood clots.

Notwithstanding the above testimony of Linke and Dr. Yarkony, the majority determines that the jury

improperly affixed damages for future medical costs in an amount exceeding the experts' estimates by $1.5 million. The majority concedes that the jury could properly compensate Richardson for medical costs not otherwise included in the experts' calculations. The majority permits one third of the excess award to stand, and concludes that $500,000, rather than $1.5 million, represents the appropriate additional sum the jury could award in excess of Linke's upper bound estimate of $9.5 million. In so holding, the majority usurps the jury's function and substitutes its own judgment regarding what is reasonable and fairly supported by the expert economic and medical evidence with respect to the present value of Richardson's future medical costs. The majority's application of remittitur in the case at bar thereby operates as an arbitrary limitation on the jury's ability to assess the evidence. See, *e.g.*, *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992); *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 207 (1996); *Riley v. Koneru*, 228 Ill. App. 3d 883 (1992); *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458 (1987); *Shaheed v. Chicago Transit Authority*, 137 Ill. App. 3d 352 (1985); *Guerrero v. City of Chicago*, 117 Ill. App. 3d 348 (1983).

In *Riley*, 228 Ill. App. 3d at 887-88, the appellate court summarized the applicable law of remittitur:

> "Damages are a question of fact to be decided by the jury, and courts are reluctant to interfere with the jury's exercise of discretion in this area. [Citations.] A reviewing court will not disturb a jury's award of damages unless it is obviously the result of passion or prejudice. [Citation.] Furthermore, an award is not excessive unless it falls outside the necessary limits of fair and reasonable compensation or it shocks the judicial conscience. [Citation.] A jury's award will not be subject to remittitur where it falls within the flexible range of conclusions which can be reasonably supported by the facts. [Citation.]"

In *Barry v. Owens-Corning Fiberglas Corp.*, the court rejected defendant's argument that a wrongful death award of $6,850,000 and a total verdict in excess of $12 million was grossly excessive and should have been reversed or subject to remittitur. The court stated, "Reviewing courts rarely disturb jury awards. For good reason. *** [Jurors] use their combined wisdom and experience to reach fair and reasonable judgments. We are neither trained nor equipped to second-guess those judgments about the pain and suffering and familial losses incurred by other human beings." *Barry*, 282 Ill. App. 3d at 207.

Nothing in the record or the itemized jury verdict indicates that the jury departed from its customary duty to weigh the evidence and assess damages that would fairly compensate Richardson for her permanent and disabling injuries. The jury's award for future medical expenses, which arguably exceeded certain testimony, does not warrant the conclusion that the jury's determination was a departure from the flexible range of damages that was reasonably supported by the facts. There is no indication that the jury's award was the product of passion or prejudice. In fact, with respect to a different component of damages, *i.e.*, Richardson's past and future lost earnings, the jury awarded a sum that was $1.265 million *less* than the higher of the testimonial estimates presented for that item of damages. If experts' estimates of a person's future income losses or medical expenses were an exact science capable of mathematical precision, there would be no need to have a jury make the final determination of proven damages.

In the case at bar the jury heard all of the evidence, including the basis for the expert testimony. It appears uncontested that the evidence of Richardson's future medical expenses did not include every anticipated item, such as special equipment and repeated hospitalizations

that are likely to occur in the future because of the serious conditions Richardson suffers as a result of her quadriplegia. The testimonial estimate of the present cash value of Richardson's future medical needs is only that—an estimate. This estimate was elicited as a minimum projection of Richardson's medical needs in the years to come. In light of these considerations, I would affirm the appellate court's holding that the variance between the jury's award for future medical needs and the experts' projection is "certainly not so great a variance that we must reject the verdict of people whom we have instructed to use their own observation and experience in the affairs of life during their deliberations."

Similarly, I depart from the majority's holding that Ann McGregor's damages award of $100,000 for pain and suffering was excessive. The majority orders a remittitur of $50,000 as a "more appropriate figure for pain and suffering." 175 Ill. 2d at 115. The majority appears to base its conclusion on the relatively minor injury McGregor sustained, noting that she suffered a laceration on her forehead that healed with only minimal scarring. Although the majority views the award of $100,000 as overly generous for a facial laceration that did not result in permanent disfigurement, the majority substitutes its own subjective judgment for the jury's evaluation of the evidence. The record indicates that McGregor's lacerated forehead took six months to heal. The record further indicates that she suffered ongoing trauma, including recurrent nightmares resulting from the rear-end collision that left the other occupant of the car a quadriplegic. The jury, as finder of fact, had the superior ability to assess the evidence, including McGregor's testimony relating to her traumatic and painful experience. I am aware of no sound reason to nullify the function of the jury and arbitrarily reduce McGregor's award for pain and suffering to

$50,000. Therefore, I cannot concur in the reasoning or result of the majority with respect to the reduction by remittitur of both plaintiffs' verdicts.

For the reasons stated, I concur in part and dissent in part from the judgment of the majority.

JUSTICE FREEMAN joins in this partial concurrence and partial dissent.